304 So.2d 361 (1974)
David CORNISH
v.
FORD, BACON & DAVIS CONSTRUCTION CORPORATION et al.
No. 9870.
Court of Appeal of Louisiana, First Circuit.
June 28, 1974.
On Rehearing November 12, 1974.
Writ Refused October 4, 1974.
*363 Iddo Pittman, Jr., Hammond, for Ford, Bacon & Davis Const. Corp., Aetna Casualty & Surety and Fla. Gas Transmission.
Robert J. Vandaworker, Baton Rouge, for Giardina, Giardina and Southern Farm Bureau Cas. Co.
Burrell J. Carter, Greensburg, for appellee.
Before LANDRY, ELLIS and PICKETT, JJ.
LANDRY, Judge.
The appeals taken herein are from judgment rendered in favor of plaintiff (Cornish) for injuries sustained in a night time collision between a 1968 Cadillac owned and operated by Cornish and a Holstein cow belonging to defendant, Angelo J. Giardina (Giardina). The animal in question, together with several other cattle owned by Giardiana, escaped from the fenced pasture leased by Giardina. The exodus was through a temporary gap erected in the pasture fence by Ford, Bacon and Davis Construction Corporation (Contractor) during construction of a pipeline across the pasture for Florida Gas Transmission Company (Florida Gas). The trial court rendered judgment in favor of Cornish against Giardina and his insurer, Southern Farm Bureau Casualty Insurance Company (Southern Farm), Contractor and Contractor's insurer, Aetna Casualty and Surety Company (Aetna), and Florida Gas in the sum of $28,371.94. Judgment was also rendered in favor of Florida Gas against Contractor and Aetna on Florida Gas' third party demand, pursuant to contractual provisions wherein Contractor undertook to indemnify Florida Gas against all claims arising from the construction project. The trial court also rejected the third party demand of Giardina and Southern Farm against Contractor based on an alleged indemnification agreement.
All defendants have suspensively appealed contending, inter alia, the award to Cornish is excessive. Giardina and Southern Farm further contend they were improperly cast and alternatively complain of rejection of their third party demand against Contractor. Florida Gas contends judgment was erroneously rendered against it in favor of Cornish. Contractor and Aetna claim that Cornish's demands should be rejected as to them, but make no complaint concerning judgment rendered against them on Florida Gas' third party demand. Consequently, these appeals concern: (1) the liability of Giardina and Contractor; (2) the alleged contributory negligence of Cornish, and (3) the quantum due in the event either Giardina or Contractor, or both, be found liable.
We reverse that portion of the judgment holding Florida Gas liable to Cornish, and also reverse the judgment in favor of Florida Gas against Contractor and Aetna on Florida Gas' third party demand. We affirm the judgment in favor of Cornish against Giardina and Southern Farm and against Contractor and Aetna; we also affirm the judgment rejecting Giardina's third party demand against Contractor and Aetna.
Giardina, a dairy farmer, kept approximately 35 head of cattle in the rented pasture which is situated in St. Helena Parish. The pasture was completely fenced. Ingress *364 and egress was provided by two metal gates. Giardina kept the gates locked to prevent the cattle from escaping and roaming at large in violation of a local stock ordinance. Subject pasture is bounded on the north by La. 1045, a two-laned, black-topped highway which runs from east to west. The highway is straight. Just to the west of the pasture is a hill. Giardina resided in Tangipahoa Parish, a short distance east of the pasture.
In late June, 1972, Contractor commenced building a thirty inch gas transmission line across the pasture pursuant to a contract with Florida Gas, which concern had acquired a 50 foot right of way for the project. The contract provided that Contractor would indemnify Florida Gas against the claims of all persons whomsoever arising from the work. To accommodate its construction equipment and provide access to the right of way within the pasture, Contractor removed a 70 to 80 foot section of the fence by simply cutting the barbed wire strands next to the permanent posts nearest each extremity of the gap and removing the intervening posts and wire. Contractor then constructed what we shall refer to as gap fences.
Although confusing, the evidence predominates in favor of the conclusion that the gap was approximately 90 feet in width and constructed with the wire taken from the permanent fence. It also appears that and H frame was constructed in the approximate center of the gap. This device consisted of two fence posts imbedded in the ground about 6 to 7 feet apart and connected by a horizontal bar consisting of a fence post removed from the gap area. To close the opening, Contractor installed a removable gap fence made in two sections. Each section was constructed of two by four end pieces or "pull posts" with intervening two by twos to which four strands of barbed wire were attached. The manner in which the wire was strung is one of the crucial issues herein. Each H frame post and permanent fence post used as an anchor post was provided with a wire loop about six inches above the ground and one near the top. To close the gap, Contractor simply inserted each end of a pull post into the wire loops on each anchor post. The gap fences were further secured by means of ropes used to pull the gap fence taut and tie the top of each pull post to the anchor posts. When Contractor needed to open the gaps, the top ropes were untied, the pull ropes freed from the restraining wire loops, and the gap section on either or both sides thus removed as conditions required.
The work progressed some three to four weeks without incident. On Wednesday, July 19, 1972, when the project was almost completed, Giardina left for a vacation. His son, A. Thomas Giardina, remained in charge of the dairy. At approximately 1:00 A. M., Sunday, July 23, 1972, a clear and dry morning, J. B. Courtney, a neighbor of the Giardinas, upon returning home, noted that some of the Giardina cattle were upon the highway. When he arrived at his home, Courtney called the Giardina residence and, after talking with young Giardina, set out to pick up Giardina and assist him in rounding up the cattle. Prior to Courtney's and Giardina's arrival, Robert Anderson was traveling westerly along Highway 1045 toward the area where the cattle were loose. Cornish approached the area from the west. As the two vehicles approached each other, a cow upon the highway was struck by Anderson's vehicle and knocked into the path of Cornish's oncoming car. The impact occurred on the highway within a few feet of the cattle gap which, following the accident, was found to be down. Although only one animal was involved in the accident, several cows were out of the pasture near the opening. None of the animals, however, had strayed very far from the gap.

THE ALLEGED CONTRIBUTORY NEGLIGENCE OF PLAINTIFF, CORNISH.
Cornish testified he was proceeding east in his proper lane of travel at a lawful *365 speed with his headlights burning. He noted the approach of the Anderson vehicle. When he was a short distance from the oncoming vehicle, he hit an animal which suddenly appeared in his path. He stated he had no time to apply his brakes or take any evasive action. In effect, he stated he struck the animal at just about the time he saw it. His testimony as to speed and point of impact was corroborated in some parts by the investigating officer and in others by Anderson and other witnesses. No purpose would be served by a detailed consideration of the testimony of the witnesses on this issue. It suffices that the record fails to establish that Cornish was negligent in any respect.

CONTRACTOR'S ALLEGED NEGLIGENCE
Contractor's employees testified in substance that in building the gap fences, the barbed wire was wrapped around each pull post and also around every intervening post and then stapled to each such member. They further testified that when work was ceased for the week end on the preceding Friday, the gap fences were put in place and secured to each anchor post. One such employee testified that on Saturday he passed the site and noted from his vehicle that the gap was still up and intact. Young Giardina also testified that when he fed the cattle in this pasture on Saturday morning, the gap fences appeared to be standing and in good order.
Shortly after the accident, a motorist, Richard Davis, arrived at the scene and stopped to render assistance. He found cattle on the highway and noted that some of the cattle were attempting to reenter the pasture through the gap, the wires of which were down. He proceeded to drive the cattle through the open gap and was soon assisted by Courtney and young Giardina who arrived later. Still later, a state trooper was dispatched to the scene. After completing his report, it was discovered the gap would require reconstruction to prevent the cattle from again escaping. In essence; Davis, Courtney and Giardina testified that the gap wires were stapled to each pull post, but were merely wrapped around the intervening two by twos. They all observed that the absence of staples permitted the wires to slide down the intervening posts to the ground thus opening a way for the cattle to escape. They further testified that young Giardina was sent to get equipment to make repairs. He returned with barbed wire, staples, fence posts and a post hole digger. The gap wires were then stapled to the intervening posts, the H frame posts and anchor posts, and a permanent fence post was imbedded in the ground in the middle of the gap to which the barbed wires were further secured by staples.
The trial court concluded the gap was negligently constructed in that the strands of barbed wire were not secured to the intervening posts thus permitting the wires to fall. Contractor's negligence in this regard was found by the lower court to be a proximate cause of the cattle escaping and the resulting accident and injuries to plaintiff. In view of the testimony of record, we find no manifest error in these factual determinations and affirm same.

GIARDINA'S ALLEGED NEGLIGENCE
It is settled law that an owner is not liable for damages resulting from loose stock where cattle and other livestock are prohibited by law from roaming public highways, unless the owner is negligent in allowing his animals to escape. In such instances, however, the burden of proof is upon the owner to establish his freedom from negligence. Fortenberry v. McCoy, 233 So.2d 320. Although Fortenberry, above, dealt with a violation of a state statute, LSA-R.S. 3:2803, prohibiting cattle from roaming at large upon state highways, the principle therein announced is applicable to violations of local option stock laws enacted by a parish governing *366 authority pursuant to LSA-R.S. 3:3001, such as is involved herein.
We find Giardina negligent, as did the trial court. Although fully aware the gap had been made, he made no inspection thereof other than casual, distant observation while attending his cattle. As an owner of cattle, Giardina is legally responsible for the condition of his fences. We think this duty extends even to the construction of a temporary gap necessitated by construction on the leased pasture. While Giardina had no actual control over Contractor, Giardina was under the obligation of preventing his cattle from escaping. A reasonable inspection of the gap would have revealed its defective condition which Giardina could then have either fixed or called to the attention of the Contractor. Giardina failed to make such an inspection; his failure constituted both negligence and a proximate cause of the cattle escape.

GIARDINA'S THIRD PARTY CLAIM AGAINST CONTRACTOR AND AETNA
This claim must be rejected for two reasons. First, our finding of negligence of Giardina's part makes him a cotort feasor. As such, he is responsible for plaintiff herein in solido with Contractor. Secondly, the record is devoid of proof of any basis on which Contractor may be held liable to Giardina by way of indemnification.

LIABILITY OF FLORIDA GAS
The trial court did not assign reasons for his judgment holding Florida Gas liable to Cornish.
Under our well established law, an owner is not liable to third parties for the negligent acts of a contractor where the contractor undertakes performance of a work pursuant to a contract in which the owner furnishes plans and specifications, and possesses only the right to insist that the job be performed in accordance with the contract plans and specifications. Crutti v. Frank, La.App., 146 So.2d 474, and cases therein cited. In this instance, the contract expressly provides that Contractor is an independent contractor with complete supervision and charge of the work, and is accountable to owner only for the completion of the job in accordance with contract plans and specifications. The testimony corroborates this legal relationship. The judgment of the trial court holding Florida Gas liable is clearly erroneous and is reversed. Inclusion of an indemnity clause in the contract does not serve to enlarge owner's responsibility to third parties; it was merely a protective device required by owner as a further insurance against the claims of third parties. It follows that the judgment in favor of Florida Gas' third party demand must also be reversed.

QUANTUM
At the time of the accident, plaintiff was, and still is, employed as a custodial employee by the St. Helena Parish School Board at a gross monthly salary of $456.16, payable twelve months per year. Plaintiff's duties as such consisted of sweeping, washing, waxing and polishing floors in certain areas of the St. Helena High School, which duties require considerable heavy manual labor. In addition, plaintiff performed light maintenance work such as replacing light bulbs and switches when necessary. Plaintiff was also employed by the Parish as a contract school bus driver at a salary of $140.00 monthly.
On Monday, July 24, the day after the accident, plaintiff consulted Dr. Ben L. Newell, general practitioner, formerly of Amite, Louisiana, who, at the time of trial, had moved to Arizona. Dr. Newell found plaintiff suffering from multiple abrasions and contusions, a painful and swollen right knee and low back pain, which was attributed to a compression fracture of the lumbar spine at L-5, based upon X-rays taken of that area. Believing the fracture would heal with conservative treatment, Dr. Newell *367 prescribed analgesics, muscle relaxants and rest. Dr. Newell felt plaintiff should be able to resume work in about six months. On November 5, 1972, Dr. Newell took more X-rays, continued conservative treatment, and was of the opinion plaintiff should be able to resume work in a short time. Dr. Newell last saw plaintiff in late December, 1972, at which time he found plaintiff progressing and felt that plaintiff could go back to work by March, 1973. Dr. Newell was unaware that plaintiff had been involved in an accident in late September, 1972, while plaintiff was driving a school bus.
On September 30, 1972, plaintiff was seen by Dr. L. E. Stringer, general practitioner, following an accident in which a school bus being driven by plaintiff was struck by another vehicle. Dr. Stringer found plaintiff suffering from injuries consisting of a laceration of the posterior aspect of the right arm, contusions of the left shoulder accompanied by pain in that area, anterior chest pains and bodily abrasions. Plaintiff was not hospitalized. On October 10, 1972, Dr. Stringer removed the sutures from plaintiff's arm and found that plaintiff had no complaints. On this date, plaintiff was discharged. Dr. Stringer considered plaintiff's injuries minor.
On March 5, 1973, plaintiff was seen by Dr. Robert E. L. Stuart, Radiologist, who X-rayed plaintiff at the site of plaintiff's apparent back trouble, namely, the L-5, S-1 spinal area. Dr. Stuart also examined the X-rays previously taken by Dr. Newell, and concluded these pictures did not disclose a compression fracture, but revealed a congenital condition known as spondylolysis at the L-5, S-1 joints, which condition is often mistaken for spondylolisthesis. He explained that spondylolysis may remain dormant indefinitely and frequently develops into spondylolisthesis as the result of trauma, and that the two conditions result in substantially similar symptoms, namely, pain in the affected area and inability to lie or stand still, all of which symptoms were exhibited by and formed part of plaintiff's case history. He also explained that spondylolysis may develop into spondylolisthesis very abruptly, with or without trauma, or from light as well as heavy trauma. He was of the view that plaintiff's condition was the result of the July, 1972 accident if plaintiff had no subsequent condition which aggravated the dormant condition noted.
On September 20, 1972, plaintiff was examined by Dr. Rufus H. Alldredge, orthopedic specialist. Plaintiff related a history of an automobile accident resulting in low back pain, pain in the right knee and pain in the right leg below the knee. Dr. Alldredge took X-rays of the spine, right knee and leg, all of which proved negative as to either fracture or spondylolysis or spondy-lolisthesis. However, upon reviewing the X-rays taken by Dr. Newell on July 24, 1972, Dr. Alldredge noted evidence of spondylolysis which prompted him to again review his own X-rays. Upon doing so, he noted evidence of spondylolysis which he admittedly missed on his initial examination. In essence, Dr. Alldredge concluded plaintiff suffered from neither a fracture nor spondylolisthesis, and concluded that plaintiff should be totally recovered within two or three months. Later he examined X-rays of plaintiff's back taken March 5, 1973, without further examination of plaintiff personally. These latter pictures confirmed the presence of spondylolysis.
Plaintiff attested to continuous pain in the low back and right knee from the time of the initial accident until time of trial. He further stated he did not injure his back in the subsequent school bus accident. He also testified that since the first accident, he has engaged assistants to help in the performance of his janitorial duties and driving his school bus.
The record discloses that, as a janitor, plaintiff was present on all 20 work days in July, 1972, but that credit for two weeks of this time was obtained through use of accumulated sick leave. In August, plaintiff was present on all 20 work days. During *368 September, plaintiff lost five work days during which time he furnished a substitute and for which he received pay attributed to sick leave. On all days that plaintiff missed work, he furnished substitutes who did his janitorial chores. The record does not disclose any evidence of payment to these individuals by plaintiff other than plaintiff's unsupported statement they were paid. Plaintiff did not testify as to any amount paid nor offer receipts, checks or other evidence of payment. As a school bus driver, plaintiff missed approximately the same number of days as he did as a janitor. During these absences, plaintiff's brother drove for plaintiff. Again no evidence of payment for such services, other than plaintiff's uncorroborated statements, appears of record.
The trial court found that plaintiff was totally disabled for two months from the date of subject accident; that plaintiff was partially disabled to time of trial, and that plaintiff would remain partially disabled indefinitely. So finding, the lower court awarded plaintiff $1,192.32 for past lost earnings, and $25,000.00 for past and future pain, suffering and disability and probable loss of future earnings. Appellants contend the award for past earnings is not fully substantiated, and the allotment for pain, suffering, disability and loss of future earnings is grossly excessive in that plaintiff is not disabled as evidenced by his return to full employment, and also because plaintiff's difficulties are attributable, at least in part, to the subsequent bus accident.
Plaintiff's claim for $12,000.00 allegedly spent to engage employees to replace him prior to trial is totally without corroboration. Plaintiff produced no receipts or canceled checks showing amounts paid; neither did he produce any person so engaged to substantiate payment for services rendered. We find, however, that plaintiff is entitled to $570.20 as lost janitorial wages for five weeks lost during July, September and October, 1972, for which plaintiff was compensated by taking sick leave. Dull v. Employers Liability Assurance Corporation, La.App., 233 So.2d 43. It appears plaintiff lost three weeks employment as bus driver for which he received compensation by taking sick leave. Since plaintiff's salary in this capacity was $130.00 monthly, plaintiff is entitled to $105.00 for wages lost as a bus driver. Dull, above. Plaintiff is therefore entitled to past lost wages totaling $675.20.
We find the award of $25,000.00 for pain, suffering, disability and loss of future wages to be grossly excessive. The medical evidence does not support plaintiff's claim of continued disability to date of trial. Plaintiff's contention that he will experience intense future pain for a prolonged period is not supported by the medical evidence. We find that the most liberal interpretation of the medical evidence justifies the conclusion that plaintiff's disability, for all practical purposes, did not extend beyond March, 1973. We likewise find the record fails to substantiate Appellants' claim that plaintiff's condition was aggravated by the subsequent bus accident. Additionally, the record is barren of proof that plaintiff will sustain a loss of future earnings. Accordingly, we reduce the award of $25,000.00 for pain, suffering, disability and loss of future wages to the sum of $15,000.00.
The trial court awarded plaintiff $1,795.02 as the cost of repairing the damage to plaintiff's 1968 Cadillac sustained in the accident. Plaintiff introduced in evidence an estimate by a reputable appraiser in the amount stated. Plaintiff, however, undertook to purchase the parts himself and have the repairs made by a body repair shop for a total of $1,880.00. We find the trial court correctly awarded recovery of the smaller amount.
Plaintiff was awarded $250.00 for medical treatment rendered by Dr. Newell based on the doctor's deposition to the effect his charge was between $200.00 and *369 $300.00. However, statements from Dr. Newell, appearing of record, show total charges of only $159.00. Granted some difficulty might be expected in this area because of Dr. Newell having moved to Arizona, nevertheless, plaintiff must establish each element of his claim by proper evidence. The award for this item is therefore reduced to $159.00. Charges by Dr. Stuart in the sum of $134.60 are adequately supported and were correctly allowed.
The judgment in favor of plaintiff Cornish against defendants, Giardina, Southern Farm, Contractor and Aetna, is affirmed, but amended to reduce the amount awarded to the sum of Seventeen Thousand Eighty-Eight and 02/100 ($17,088.02) Dollars, together with legal interest from date of judicial demand, until paid, and all costs of these proceedings.
The judgments in favor of plaintiff Cornish against defendant Florida Gas, and in favor of Florida Gas against Contractor and Aetna, on Florida Gas' third party demand, are annulled, reversed and set aside. The judgment in favor of Contractor, rejecting the third party demands of Giardina and Southern Farm, is affirmed.
Affirmed in part, reversed in part, amended and rendered.

ON REHEARING
Before LANDRY, SARTAIN and ELLIS, JJ.
LANDRY, Judge.
A rehearing was granted herein limited to review of Giardina's liability to plaintiff, David Cornish, and reconsideration of Giardina's third party demand for indemnity from Ford, Bacon & Davis (Contractor), and Contractor's insurer, Aetna Casualty and Surety Company (Aetna). We acknowledge our error in holding Giardina liable for negligently having failed to inspect his pasture fence.
We reaffirm our initial holding that in cases of this nature, the burden rests upon the owner of cattle to establish his freedom from negligence. Fortenberry v. McCoy, 233 So.2d 320. However, in this instance, we find no violation of a duty on the part of defendant Giardina.
Our further review of the record discloses that the gap was constructed by Contractor's employees on June 20, 1972. On Thursday, July 20, 1972, the gap was reduced to approximately one-half its former size under the supervision of Contractor's employee, Thomas F. Guice, who closed the western half of the opening. Guice installed permanent center posts, and in effect rebuilt the western half of the gap fence. The eastern half of the gap (the place where the pipeline right of way was situated, and also the place where the cattle escaped) was left as a gap which could be opened and closed. The cattle escaped early in the morning of Sunday, July 23, 1972, through this rebuilt area.
In our original decree, we held Contractor liable because of negligence in building the gap, namely, its failure to properly staple or otherwise affix the barbed wire to the posts which formed the closure. Our reconsideration of the evidence convinces us we correctly affirmed this factual finding by the trial court.
Apparently the gap was secure from initial construction until it was rearranged on July 20, 1972. In any event, it was sufficient to contain the cattle during this period. Had Giardina inspected the gap prior to July 20, 1972, it may reasonably be presumed, under the circumstances, that he would have found it in order. Immediately following the accident, the gap fence was inspected by the younger Giardina, Richard Davis and J. B. Courtney. They found that the wire was not stapled to the intervening two by two posts that formed part of the gap mechanism. It was discovered that the wires were merely wrapped around these members. These witnesses testified they obtained *370 staples and secured the wires to the posts before raising the gap back into position. We deem it logical to conclude that when the gap was reworked on July 20, 1972, Contractor's employees neglected to staple the wires. As a result, the wires slid down the posts permitting the cattle to escape, as testified by Giardina, Davis and Courtney. Only two days elapsed between the time the gap was reconstructed and the morning on which the cattle escaped. The record does not show that Giardina was aware the gap had been reworked and reduced in size. In the absence of such a showing, it would be unreasonable to hold that Giardina should have inspected the gap between July 20, and July 23, 1972. Granting that Giardina had some duty in the matter, we do not find that it included the obligation of repeated inspection. As lessee of the pasture, Giardina could not prevent Contractor's entry on the premises and construction of the gap. Neither could Giardina control Contractor's actions in the matter. There was no contractual relationship between Giardina and Contractor. If any duty was owed between these parties, Contractor was under obligation to Giardina to erect and maintain a safe gap. All of the circumstances considered, we find that Giardina acted as a reasonably prudent individual. We find no breach of a duty owed plaintiff herein. Consequently, Giardina may not be held liable to plaintiff.
Having exonerated Giardina from liability to plaintiff, it is unnecessary for us to consider the alternative demand of Giardina and Southern Farm for indemnity from Contractor.
Our original judgment is reversed and set aside insofar as it decrees defendants, Giardina and State Farm, liable to plaintiff Cornish, in solido with defendants, Contractor and Aetna, and judgment is rendered herein rejecting and dismissing plaintiff's suit against Giardina and Southern Farm, with prejudice; all costs of these proceedings to be paid by Contractor and Aetna.
Affirmed in part, reversed in part, and rendered.
PER CURIAM.
In the decretal portion of our original decree, we erred in assessing the amount of damages due plaintiff. More precisely, we did not include in total damages awarded the sum of $675.20 due plaintiff for lost wages. Plaintiff is entitled to the following items of damages: For pain, suffering and disability, $15,000.00; damages to automobile, $1,795.02; lost wages, $675.20, medical expense, $293.60, or a total of $17,763.82.
Accordingly, our former judgment is amended, and judgment rendered herein in favor of plaintiff Cornish against defendants, Ford, Bacon & Davis and Aetna Casualty and Surety Company, in the sum of $17,763.82, with legal interest thereon from date of judicial demand, until paid.