440 So.2d 920 (1983)
John Allen STEPHENS, Plaintiff-Appellee,
v.
The STATE of Louisiana, Through the DEPARTMENT OF TRANSPORTATION AND DEVELOPMENT, et al., Defendant-Appellant.
MID FLORIDA TRUCKING, INC., Plaintiff-Appellee,
v.
The STATE of Louisiana, Through the DEPARTMENT OF TRANSPORTATION AND DEVELOPMENT, et al., Defendant-Appellant.
C.H. KNIGHT LIVESTOCK, INC., Plaintiff-Appellee,
v.
Herman FISHER, d/b/a Mid Florida Trucking Company and the State of Louisiana, Through the Department of Transportation and Development, Defendant-Appellant.
Nos. 15724-CA to 15726-CA.
Court of Appeal of Louisiana, Second Circuit.
October 24, 1983.
Writ Denied January 6, 1984.
*923 John W. King, Baton Rouge, of counsel, for State of La., defendant-appellant.
Mayer, Smith & Roberts by George T. Allen, Jr., Shreveport, for Liberty Mut. Ins. Co., intervenor.
Cummings & Gambel by Gregory F. Gambel, New Orleans, for John Allen Stephens, plaintiff-appellee.
Campbell, Campbell & Johnson by James M. Johnson, Minden, for Mid Florida Trucking, plaintiff-appellee.
Bolin, Elkins & Pearce by Randy D. Elkins, Minden, for C.H. Knight Livestock, Inc., plaintiff-appellee.
Before JASPER E. JONES, SEXTON and NORRIS, JJ.
SEXTON, Judge.
Three plaintiffs brought suit for the losses sustained in a vehicular collision allegedly caused by defendant's negligence. The trial court granted judgment in favor of all three plaintiffs. The suits of all three plaintiffs were consolidated at trial and on appeal. We affirm.
Primary plaintiff in this cause is John Allen Stephens, aged 26, a former truck driver and currently a resident of Bowling Green, Florida. The other two plaintiffs in this cause are C.H. Knight Livestock, Inc. (hereinafter referred to as Knight Livestock), and Mid Florida Trucking Company (hereinafter referred to as Mid Florida), both of which are Florida corporations. Knight Livestock is a cattle broker, and Mid Florida is a transport company. Defendant is the State of Louisiana, through the Department of Transportation and Development (hereinafter referred to as The Department).
The events which gave rise to the instant appeal transpired on July 11, 1978, at approximately 2:35 p.m. Immediately prior to that time, plaintiff Stephens was driving an 18 wheel tractor-trailer in a westward direction several miles east of Minden, Louisiana on U.S. Interstate 20, a four lane highway. A co-driver, John Carter, was present in the cab with Stephens. Stephens was pulling a 72,000 pounds gross weight, double decked, or double tiered trailer containing 98 head of cattle, which were loaded on both levels. Stephens was at that time in the employ of plaintiff Mid Florida and was driving a rig leased by Mid Florida; the cattle being transported were owned by Knight Livestock.
As Stephens crested a hill approximately 2.2 miles east of Minden, driving westward in the outside (northernmost) lane, he was passed by a car driven by Bernice Stanfield in the inner or passing lane. After passing the rig driven by Stephens, Ms. Stanfield changed lanes, moving back into the outer lane. At this point, both Stephens and Ms. Stanfield were headed in a westward direction in the same lane, with Stephens trailing Ms. Stanfield by an interval of approximately 60 feet.
About 1000 feet later, Ms. Stanfield switched back into the left (passing) lane rather abruptly. As she moved into the left lane, a flagman standing on the highway only a short distance away from Stephens' oncoming rig flagged Stephens into the left lane. As Stephens' tractor-trailer veered *924 sharply into the left lane, Ms. Stanfield's vehicle slowed in front of him, and Ms. Stanfield's brake lights lit up. Stephens veered his rig sharply to the left in an attempt to avoid a collision with Ms. Stanfield's vehicle. Stephens' rig nevertheless collided with the Stanfield vehicle, with the right side of Stephens' front bumper striking the left side of Ms. Stanfield's rear bumper. This impact sent the Stanfield vehicle spinning out of control across the right hand lane of traffic, off the right hand shoulder, and into the vegetation along the right side of the roadway.
As a result of his sharp veer to the left and the impact with Ms. Stanfield's vehicle, Stephens' rig briefly entered the median or barrow pit separating the westbound and eastbound lanes of traffic. Stephens then steered to the right in an attempt to re-enter the roadway. However, Stephens overcorrected and the tractor-trailer tipped over onto its left side. The tractor-trailer thereafter slid down the roadway in a westerly direction for approximately 250 feet, striking a Department of Transportation and Development dumptruck parked on the right hand shoulder, knocking it some 120 feet along the roadway and ultimately off the right hand shoulder, and into the right-of-way along the north side of the highway. It appears the co-driver, John Carter, was asleep at the time of the accident.
Plaintiff John Stephens suffered a traumatic partial amputation of his left leg in the accident. The condition of his left leg necessitated its surgical removal three inches below the knee that same day in the emergency room of the Minden Medical Center. Plaintiff's left leg thereafter developed a severe infection. Mr. Stephens remained hospitalized for a month following the accident, and subsequently resided for three months at the home of his mother-in-law, an LPN, who gave him constant medical care during that time period, irrigating, repacking and redressing his wound twice daily. Because of his physical disability, Mr. Stephens was unableduring the four year lapse between the accident and the conclusion of trialto remain employed for any appreciable lapse of time. Stephens' co-driver, John Carter was uninjured.
The tractor-trailer driven by Stephens, and leased by plaintiff Mid Florida, sustained substantial damage. Of the 98 cattle owned by Knight Livestock, 30 were either killed or lost; the remaining 68 cattle were sold shortly thereafter at auction in an attempt at partial loss recoupment. Although her car was damaged in the wreck, Ms. Bernice Stanfield emerged from the collision uninjured, as did three state highway employees present at the time of the wreck. They had scrambled to safety and successfully evaded the tractor-trailer as it slid on its side down the highway.
Plaintiffs John Stephens, Mid Florida, and Knight Livestock all filed suit against the Louisiana Department of Transportation and Development in 1979, alleging that The Department's negligence had precipitated the accident-related losses of July 11, 1978. An intervention was filed by Liberty Mutual Insurance Company, the workers' compensation insurer that had paid John Stephens' medical expenses and disability benefits pursuant to Florida law. The claims of all plaintiffs and intervenor Liberty Mutual against Bernice Stanfield and her insurer were contractually compromised and released; all third party indemnification claims by The Department and other parties against Ms. Stanfield and her insurer were also compromised and released. Ms. Stanfield similarly compromised and dismissed all claims and indemnification demands against all other parties to the litigation, and Bernice Stanfield's potential liabilities and causes of action were therefore eliminated from the instant litigation.
In a scholarly and well considered opinion filed December 20, 1982, the trial court granted judgment against defendant, The Department, and in favor of plaintiffs John Stephens, Mid Florida and Knight Livestock, and intervenor Liberty Mutual Insurance Company. The court awarded $590,000 to plaintiff Stephens for pain, disability and loss of earnings, stipulating that $59,725.94 of this amount should be paid to *925 intervenor Liberty Mutual for the compensation payments previously made by it to Stephens. The court awarded $42,625.46 to plaintiff Mid Florida, the transport company which employed John Stephens at the time of the accident, and owned the tractor-trailer damaged in the wreck. This award represented the damages to Mid Florida's tractor-trailer, the profit lost on the aborted transit of the 98 cattle, and the loss of a lucrative and on-going business relationship with Knight Livestock which directly resulted from the accident. The trial court awarded plaintiff Knight Livestock $11,287.98 for the thirty cows that were lost or killed in the accident.
The Department has appealed the judgments granted against it, assigning six errors. The Department contends that the trial court erred in finding that it negligently caused the accident of July 11, 1978, and in finding that plaintiff John Stephens was free of contributory negligence in causing said accident. The Department contends that the trial court erred in accepting state troopers as experts, in refusing to accept State's witness, Russell Willie, as an expert, and in refusing to grant a new trial. The Department contends, finally, that the trial court erred in refusing to admit into evidence taped telephone conversations between The Department's trial counsel and plaintiff Herman Fisher, owner of Mid Florida, and taped telephone conversations between said counsel and John Stephens' co-driver, John Carter. The Department has not challenged on appeal the quantum of the judgments awarded by the trial court in favor of plaintiffs and intervenor. The six assignments of defendant-appellant The Department are singly treated herein.

Assignment I.

The Trial Court Erred in Finding that The Department Negligently Caused the Wreck.
The statutory bases for negligence actions are Civil Code Articles 2315 and 2316. Article 2315 provides that "Every act whatever of man that causes damage to another obliges him by whose fault it happened to repair it." Article 2316 states that "Every person is responsible for the damage he occasions not merely by his act, but by his negligence, his imprudence, or his want of skill." The principal juridical element of an action in negligence is a duty, apparent to reason and common sense, to avoid acts and omissions which engender an unreasonable risk of harm to others. In order to prevail in a negligence action, the plaintiff must prove the existence of such a duty, the breach of that duty, and that damages have been caused by its breach. Plaintiff must additionally show that the harm suffered could have been foreseeably associated with the breach of the duty, and that this harm was the type of injury that the duty was designed to prevent. See generally, Callais v. Allstate Insurance Co., 334 So.2d 692 (La.1975); Williams v. Louisiana Machinery Co., Inc., 387 So.2d 8 (La.App. 3d Cir.1980); Williams v. City of Alexandria, 376 So.2d 367 (La.App. 3d Cir.1979); Traders & General Insurance Co. v. Robison, 289 So.2d 178 (La.App. 1st Cir.1973).
The duty of The Department has been more specifically enunciated by statute and case law. LSA-R.S. 48:35 mandates that The Department "shall adopt minimum safety standards with respect to highway design, construction and maintenance." The law imposes upon The Department the duty of maintaining public roads in a safe condition so as to not expose the public to unreasonable dangers. This general duty includes in its scope the more specific duty of providing proper safeguards or adequate warnings of dangerous conditions on the highway. The Department clearly has a duty to warn motorists of dangers engendered by ongoing road repair. The duty of reasonable care operative under negligence principles requires The Department to erect barriers, signs and markings which are sufficiently effective to warn the public of dangerous road conditions. Warnings should be sufficient to alert the ordinary motorist. The law imposes a high degree of care on governmental agencies charged with the responsibility *926 of maintaining traffic signs, signals and warning devices. See, e.g., Vervik v. State Dept. of Highways, 302 So.2d 895 (La.1974); Brandon v. State, Through Dept. of Highways, 367 So.2d 137 (La.App. 2d Cir.1979), writs refused, 369 So.2d 141 (La.1979); Von Cannon v. State Dept. of Highways, 306 So.2d 437 (La.App. 3d Cir.1975), writs refused, 309 So.2d 681 (La.1975); Hale v. Aetna Casualty & Surety Co., 273 So.2d 860 (La. App. 2d Cir.1973), writs refused, 275 So.2d 867 (La.1973); Petree v. Crowe, 272 So.2d 399 (La.App. 2d Cir.1973), writs refused, 274 So.2d 709 (La.1973); Funderburk v. Temple, 268 So.2d 689 (La.App. 1st Cir.1972), writs refused, 270 So.2d 875 (La.1973); Falgout v. Falgout, 251 So.2d 424 (La.App. 1st Cir. 1971); Kilpatrick v. State, 154 So.2d 439 (La.App. 2d Cir.1963).
On the date of the accident, a three man highway maintenance crew employed by The Department was engaged in repairing potholes approximately 2.4 miles east of Minden, as John Stephens approached them from the east. Shortly before the accident, the crew located a large pothole in the right or northernmost of the westbound lanes which required repair; the pothole to be repaired was located in the right hand lane approximately 1500-2000 feet to the west of a crest in the hill over which the highway ran. The State crew parked their dumptruck on the right shoulder directly across from the pothole requiring repair, and disembarked from the vehicle. One of their number was stationed approximately 50 feet behindor to the east ofthe State truck as a flagger, and equipped with a small "paddle" which read "slow" on one side and "stop" on the other. The flagman stood near the center line of the westbound lanes. The other two members of the work crew then proceeded to remove broken pieces of concrete from the pothole and place this concrete debris on the side of the road. The two maintenance men had completed removing the broken concrete from the pothole, and just before the accident had returned to the right shoulder to obtain hot mix from the State truck to place in the pothole.
As these repair attempts proceeded, John Stephens neared the repair site in his tractor-trailer. Ms. Stanfield passed Stephens as he crested the hill and returned to the right lane as they neared the maintenance crew, with Stephens following her in the same lane by approximately 60 feet. Shortly before Ms. Stanfield reached the flagman, he flagged her into the left lane. The flagman then flagged John Stephens into the left lane when Stephens was only about 100 feet away from the flagman, and as the flagman stood only fifty feet away from his fellow workmen and the DOTD truck parked on the right hand shoulder. Stephens was forced to swerve sharply into the left lane to avoid striking the flagman, at which time he collided with the rear of Ms. Stanfield's vehicle and the previously described sequence of events ensued.
The trial court found, correctly we believe, that The Department's mode of operations were careless and substandard in several significant respects. The Department violated common sense rules imposed by tort law to avoid acts and omissions which foreseeably engender unreasonable risks of harm; moreover, The Department violated its own regulations promulgated in the "Maintenance Traffic Control Handbook."
The Department employees' actions were negligent, in the first instance, insofar as the flagman was stationed a scant 50 feet from the repairmen themselves; such a short interval of warning, given normal highway speeds, provides highway travellers with woefully inadequate warning time. The danger of providing such short advance notice that the driver must abruptly change lanes is compounded where, as here, the thoroughfare is heavily travelled and there is thus a substantial likelihood that there will already be traffic in the lane to which the warned driver must transfer. The negligence of The Department flagman in giving John Stephens such short notice of the looming hazard was exacerbated by the apparent fact that the flagman did not wave John Stephens into the left lane until John Stephens was approximately 100-150 *927 feet away. It is further significant that this flagman testified that he was given no safety instructions or training by the State prior to his active duty.
The trial court found it especially significantand rightly sothat The Department's employees utilized virtually no traffic devices, signs, warning signals, lights or barriers. The only sign present was a road construction sign located some 400 feet to the east of the accident site; however, this sign did not impose a speed limit, did not signify a lane closure, did not specify the hazard or type of construction present, and was of such a type as is generally followed by more specific directives. It is further significant that the sign had not been placed with respect to the pothole repair, but with respect to an entirely different maintenance project further to the west which, at the time of the accident, had been partially or wholly completed. Thus, although The Department's repair work on the outer lane of the roadway itself necessitated at least a temporary closure of that lane, The Department did not utilize a single traffic sign, device or warning light to signal the imminent lane closure and the repair work transpiring in the right hand lane.
The trial court found it significant that the conduct of The Department's employees violated The Department's own "Maintenance Traffic Control Handbook." That safety manual specifies that where the closure of the exterior lane of a multi-lane highway is necessary for fewer than 15 minutes, the following measures must be effectuated at an absolute minimum: the work vehicle must be mounted with a flashing light, a warning sign and two flags, moreover, a "special secondary vehicle" must be stationed at least 150 feet behind the work site, and it must also be equipped with a flashing light, warning sign and two flags.
The record is clear that none of these precautionary measures, promulgated by The Department under the authority of LSA-R.S. 32:235,[1] were complied with, and the record further indicates that The Department's employees were almost completely unconversant with the import of these rules. The violation of these quasi-statutory rules is highly indicative of negligence. See Tolbert v. Ryder, 345 So.2d 548 (La.App. 3d Cir.1977); Taylor v. Texas & New Orleans Railway Co., 22 So.2d 771 (La.App. 1st Cir.1945). Moreover, we concur that The Department was negligent in sending an untrained flagman to control traffic, and vicariously liable for his negligent actions/omissions in standing only 50 feet from the repair site and in not flagging John Stephens into the left lane until virtually the last possible moment. We therefore have little difficulty in ascertaining the crucial causal link between The Department's substandard conduct and the injuries complained of.

Assignment II.
The Trial Court Erred in Finding that Plaintiff John Stephens was Free of Contributory Negligence and Therefore not Barred from Recovery.
The facts which gave rise to the instant appeal occurred in the pre-comparative negligence era, in which contributory negligence barred recovery. Contributory negligence is merely negligence on the part of the plaintiffsubstandard conduct on the part of a plaintiff which exposes him to an unreasonable risk of harm, and foreseeably *928 engenders a substantial likelihood of injury or loss. Contributory negligence is thus conduct on the part of the plaintiff which falls below the standard expected of a reasonable man under like circumstances, to which standard a plaintiff should conform for his own protection. See Dupas v. City of New Orleans, 354 So.2d 1311 (La. 1978); Smolinski v. Taulli, 276 So.2d 286 (La.1973); Cambridge Mutual Fire Ins. Co. v. State Farm Fire & Casualty Co., et al., 405 So.2d 587 (La.App. 3d Cir.1981). Having applied this analytic standard to the facts of this case, we conclude that the trial court did not err in finding that plaintiff was not contributorily negligent, and in ruling that the plaintiff was therefore not barred from recovery.
We note in the first instance that plaintiff was driving at a speed of 60-62 miles per hour immediately prior to the accident, and was thus exceeding the legally allowable maximum speed by five to seven miles per hour. However, while plaintiff was thus violating traffic laws, driving seven miles per hour over the speed limit does not constitute negligence or contributory negligence per se. As the courts of this state have made clear, the violation of a safety statute creates a rebuttable presumption of negligence. Tolbert v. Ryder, supra; Cornish v. Ford, Bacon & Davis Construction Corp., 304 So.2d 361 (La.App. 1st Cir.1974), writ refused, 305 So.2d 123 (La.1974). The violation of a safety statute does not in and of itself constitute actionable negligence; it must also be shown that the action which contravenes a statute is unreasonable under the circumstances and causes the harm of which plaintiff complains. In this instance, plaintiff's violation of the traffic laws does not constitute negligence for the simple reason that this violation of prohibitive law did not cause the accident. As was made clear by the testimony of expert accident reconstruction analyst, Dr. William H. Tonn, Jr., the accident would have occurred even if plaintiff had been driving 55 miles per hour or even 50 miles per hour. This is because The Department's failure to give adequate advance warning of the lane obstruction and the presence of workmen in the road created an emergency situation in which plaintiff was forced to swerve abruptly and sharply to the left in order to avoid injuring the maintenance men, and plaintiff would have been unable to maintain control of his rig even at a substantially reduced speed. We note moreover that exceeding the speed limit by seven miles per hour on a thoroughfare originally designed to safely accommodate much higher speeds is not conduct which is so inherently dangerous as to constitute negligence per se.
We also note that plaintiff's failure to substantially reduce his speed when he encountered the road under construction sign some 400 feet to the west of the accident site, where the highway maintenance crew was engaged in road repair, was not so inherently dangerous or risk engendering as to constitute contributory negligence. We conclude, for several reasons, that plaintiff's failure to substantially reduce his speed when encountering that single traffic sign did not constitute negligence per se. A single under construction sign is hardly an invariably accurate and correct indication that highway obstruction is imminent. As was stated by Judge Hall in Brandon v. State, Through Department of Highways, 367 So.2d 137, 143 (La.App. 2d Cir.1979), writs refused, 369 So.2d 141 (La. 1979), "common experience tells us, and expert testimony ... verifies, that warning signs left up over an extended period of time with no evidence of construction activity become ineffective, particularly as to drivers who travel the road regularly even though the drivers have actual knowledge of the hazard." It is pertinent, in gauging plaintiff's response to this sign, that such signs are intended to be followed by more specific traffic directives. In this case, such specific traffic directives were conspicuously absent: no signs were placed after the original under construction sign to advise the travelling public as to the nature of any highway hazard; there were no succeeding signs to advise the public as to whether in fact a hazard even existed. The sign in question did not specifically prescribe plaintiff's *929 conduct, expressly mandate a reduction of speed, signal an imminent lane closure, or apprise plaintiff of the nature of the imminent hazard. Since such signs frequently remain posted after an existing road hazard has ceased, these signs often fail to apprise the travelling public of not only the nature, but also the existence, of imminent dangerous conditions.
The evidence preponderates that the flagger did not close the road for an uninterrupted interval of time, and that the workmen were not a continuous presence in that lane. It appears that the flagger only flagged sporadically when the workers were on the roadway itself, and that the workers moved back and forth from the roadway to the shoulder in repairing the pothole. As The Department's employees testified, they entered the roadway when traffic was light, and departed with the appearance of oncoming traffic. Thus, this sporadic flagging and the periodic and abbreviated appearances of the workers onto the roadway did not afford a continuous warning, but rather an infrequent and erratic presence.
If the flagman had been waving his flag, and had the workmen been present on the road as Stephens approached from afar, Stephens would have received adequate warning to reduce his speed and proceed with caution, and a failure to do so might have constituted contributory negligence. Smolinski v. Taulli, supra. The Department has simply failed to establish that the flagman was flagging or that the workmen were in the roadway for a sufficient period of time prior to Stephens' approach to allow him to safely change lanes.
Our conclusion as to plaintiff's freedom from contributory negligence is supported, finally, by the tort doctrine of "sudden emergency." Plaintiff is not barred from recovery where defendant creates a dangerous situation in which even the actions of a reasonably prudent and wary motorist would be insufficient to avoid collision; plaintiff is not legally answerable for the consequences of reasonable avoidance actions necessitated by defendant's negligence in creating an unreasonably risky environing circumstance. One who suddenly finds himself in a position of imminent peril, without sufficient time to consider and weigh all circumstances or best means that may be adopted to avoid an impending danger, is not guilty of negligence if he fails to adopt what subsequently and upon reflection may appear to have been a better method, unless the emergency in which he finds himself is brought about by his own negligence. Hickman v. Southern Pacific Transport Co., 262 La. 102, 262 So.2d 385 (1972); Dane v. Canal Ins. Co., 240 La. 1038, 126 So.2d 355 (1960); Commercial Standard Ins. Co. v. Johnson, 228 La. 273, 82 So.2d 8 (1955).

Assignments III & IV.
The Trial Court Erred in Accepting as Expert Witnesses State Troopers, and in Refusing to Accept as an Expert The Department's Witness, Russell Willie.
The Department has not briefed these two assignments of error which this Court may therefore consider abandoned. Rule 2-12.4, Uniform Rules of the Courts of Appeal. However, even aside from this procedural bar, neither of these alleged errors constitutes a basis for reversal. The State troopers, who were called as plaintiff's witnesses, were allowed to testify as traffic control experts and present an opinion as to the inadequacy of the warning devices used by the highway maintenance men. Assuming arguendo that the trial court erred in permitting the State troopers to render an opinion in this respect, this alleged evidentiary error does not constitute reversible error. The opinion expressed by the State troopers that the warning devices used by The Department were inadequate was cumulative at best, and did not materially affect the outcome of this case. The best evidence of the inadequacy of these warning techniques used was The Department's own manual; it is clear from this document that The Department patently violated its own regulations. The inadequacy of the warning devices employed by The Department was immediately *930 apparent to common sense, and the opinions of the State troopers in this regard were wholly inessential to this inescapable conclusion.
Moreover, we believe the trial court did not commit reversible error in refusing to accept The Department's witness, Russell Willie, as an expert in accident reconstruction. Mr. Willie was allowed to testify as to facts learned by him in his accident investigation, but was not allowed to express the opinions and conclusions derived therefrom since he lacked the background in mathematics, physics and engineering necessary to competently formulate such opinions. We conclude that the trial court did not err in refusing to allow Mr. Willie to testify outside the bounds of his expertise.

Assignment V.
The Trial Court Erred in Refusing to Admit the Transcript of Taped Telephone Conversations Between The Department's Attorney and both Herman Fisher and John Carter.
The Department proffered a transcript of taped telephone conversations between The Department's attorney and Herman Fisher, owner of Mid Florida, and between The Department's attorney and John Stephen's co-driver John Carter. The trial court refused to admit into evidence the transcripts of these taped telephone conversations on the grounds that they constituted hearsay. The conversations occurred during trial, and directly resulted from the persistent attempts of Fisher and Carter to contact The Department's attorney. Carter and Fisher offered, for respective sums of $100,000 and $50,000, to refute the testimony previously given by them at trial, which testimony tended to establish that John Stephens was an able, competent and prudent driver. Fisher and Carter offered to testify, in return for the above stated sums, that John Stephens was using amphetamines at the time of the accident; that Stephens had been driving erratically prior to the wreck; that Stephens had been driving with one foot on the dashboard at the time of the wreck; that Stephens was at that time in a drowsy state; and that shortly after the accident, Stephens instructed John Carter to remove amphetamines from the crash site.
Hearsay testimony consists of out of court statements which are offered to prove the truth of the matter asserted. Hearsay has been juridically described as evidence, the probative force of which depends upon the competency and credibility of some person other than the witness, such testimony being inadmissible because of the inherent lack of opportunity to ascertain its veracity by cross-examination. Hearsay is by its very nature second hand information knowledge of what another said as opposed to direct observation of the events or facts at issue. State In Interest of Clark, 400 So.2d 334 (La.App. 4th Cir.1981); Jones v. Ledet, 383 So.2d 1308 (La.App. 3d Cir.1980); Lambert v. Heirs of Adams, 325 So.2d 331 (La.App.3d Cir.1975), application denied, 329 So.2d 458 (La.1976); Veal v. Hutchinson, 284 So.2d 60 (La.App. 4th Cir.1973), writ denied, 286 So.2d 662 (La.1973).
It is clear that the transcribed telephone conversations are hearsay, constituted, as they are, by out-of-court statements offered to prove the truth of the matter asserted. It is true that there are certain exceptions to the general rule prohibiting the admissibility of hearsay; these exceptions are based on well-defined contextual circumstances which tend to ensure the accuracy, truth and credibility of certain hearsay statements. In these exceptional circumstances, some fact or series of facts supplies the truth-compelling function ordinarily served by oath and cross-examination.
The Department has not articulated any exception to the hearsay rule which would justify the admissibility of the hearsay statements of Messrs. Fisher and Carter. The statements of Fisher and Carter were manifestly motivated by dishonest aims and self interest. Greed dissolved the truth compelling factor present in all situations where hearsay statements are properly admissible under exceptions to the general *931 prohibiting the admissibility of hearsay statements.
In short, the proffered statements were hearsay. Moreover, they were not admissible under any exception to the hearsay rule, since they were made for purposes of illicit gain and the circumstances in which they were made greatly undermined their credibility.
Our determination that the trial court did not err in excluding these statements is supported by the consideration that the State failed to subpoena either Carter or Fisher. The failure of the State to subpoena these witnesses to testify subject to oath constitutes a salient reason for the trial court's refusal to admit the out-of-court statements of Fisher and Carter which were made without the truth-ensuring safeguards of oath and cross-examination.
For the foregoing reasons, we conclude that the trial court did not err in excluding the proffered telephone conversations between The Department's attorney and both Fisher and Carter.

Assignment VI.

The Trial Court Erred in Refusing to Grant a New Trial.
The Department moved for a new trial principally on the grounds that plaintiff's attorneys intimidated one of The Department's witnesses, the flagman working at the repair site on the date of the wreck, as well as the basis of Assignment No. V. The trial court denied this motion.
A new trial shall be granted if the jury was bribed, the judgment is clearly contrary to the law and evidence, or new evidence has surfaced which could not have been previously discovered with due diligence. LSA-C.C.P. Arts. 1814, 1972. A new trial may be granted on an equitable basis in any case "if there is good ground therefore." LSA-C.C.P. Art. 1973. It is well established in this state that the trial court's ruling on a motion for new trial will not be disturbed on review absent a palpable abuse of discretion. Simas v. Hicks, 381 So.2d 949 (La.App. 3d Cir.1980); Shows v. Williamson, 256 So.2d 688 (La.App. 2d Cir. 1972), writ denied, 261 La. 231, 259 So.2d 76 (1972).
It is clear in the first instance that the proffered statements discussed in Assignment V do not constitute grounds for a new trial since they do not constitute new evidence which could not have been obtained during trial. In the first instance, statements made in hopes of obtaining a bribe hardly constitute "new evidence." Moreover, the taped statements of Fisher and Carter were hardly undiscoverable during trial by the exercise of due diligence: these statements were made directly to The Department's attorney over the telephone during trial and The Department nevertheless did not produce the in-court testimony of these witnesses as part of its case.
The Department now asks this Court to exercise its discretionary authority under the auspices of LSA-C.C.P. Art. 1973 to reverse the trial court's denial of The Department's motion for new trial. The Department alleges, as the basis for this motion, that the plaintiff's attorneys used improper or coercive tactics to affect the testimony of the State's witness, the flagman.
This Court would not hesitate to exercise its equitable authority if attorneys used improper and coercive tactics on one of the witnesses. However, the record does not indicate that threats or coercive tactics were used by plaintiff's attorneys on the flagman. The record rather reflects that there may have been an insistent, or tense exchange between these attorneys and the flagman/witness concerning a crucial difference in this witness' trial testimony and the version of the facts he related to investigating officers shortly after the wreck. Whereas the flagman originally told State troopers he was stationed only about 50 feet from the maintenance men and the pothole they were repairing; he testified at trial that a distance of 100 feet separated him from the worksite.
While it appears from the record there may have been some exasperated interaction *932 between the flagman and the plaintiff's attorneys, it does not appear that any illegal or improper tactics were used. It appears that any exchange which occurred was of such a type as quite often occurs in emotionally charged trials in which much is at stake, and we decline to elevate a minor instance of adversarial contentiousness to a level of fraud or extortion. It is crucial that the flagman expressly admitted on the stand that plaintiff's attorneys had asked him to testify truthfully on the trial.
Moreover, The Department's allegation that plaintiff's attorneys coerced the flagman into testifying that he was only 50 feet from the workmen when he flagged John Stephens into the left lane, is repudiated by the fact that the flagman continually insisted at trial that he positioned himself 100 feet from the repair site. Thus, the allegedly improper activities did not alter the flagman's testimony and could not have possibly changed the outcome of trial. The trial court simply chose to believe the version of the facts that the flagman gave to investigating State troopers shortly after the wreck namely, that he was positioned only 50 feet from the repair site.
We uphold the trial court's denial of the motion for new trial because The Department has not offered any new evidence not discoverable during trial by the exercise of due diligence, nor has The Department made a sufficient showing that plaintiff's attorneys employed improper trial tactics.
In summary, we concur in the trial court's finding that The Department was negligent in causing the accident on Interstate 20 on July 11, 1978; and we further concur in the trial court's finding that plaintiff John Stephens was free from contributory negligence in causing said vehicular collision. We moreover conclude that the trial court did not commit reversible error in accepting State troopers as expert witnesses, in refusing to accept Mr. Russell Willie as an expert in accident reconstruction, or in refusing to admit the taped hearsay statements of Herman Fisher and John Carter. We further affirm the trial court's rule in denying the motion for new trial.
For the foregoing reasons, the judgment of the trial court is in all respects affirmed.
AFFIRMED.
NOTES
[1] LSA-R.S. 32:235 provides in pertinent part that:

"A. The department shall adopt a manual and specifications for a uniform system of traffic control devices consistent with the provisions of this Chapter for use upon highways within this state. Such uniform system shall correlate with and so far as possible conform to the system then current as approved by the United States Department of Transportation, Federal Highway Administration, provided that the department is authorized to deviate from said system and to erect advisory signs only to post advisory weight limits on state bridges where a state bridge is scheduled for replacement or strengthening within three years from the date of approval by the Chief Engineer of the department's weight rating evaluation of any state bridge."