LEMMON, Judge.
This is an appeal from a judgment based on a jury verdict which dismissed Steven Charia’s reconventional demand against the Bank of Louisiana for damages resulting from the allegedly unauthorized release of pledged shares of corporate stock.
The litigation began in 1973 when the Bank sued Charia on eight promissory notes. Charia (then represented by other counsel) reconvened, alleging various damages resulting from the Bank’s negligence, breach of trust, breach of contract and violation of federal regulations by releasing in 1968 the stock pledged as collateral for the notes. The Bank then filed a third party demand against Vincent Liuzza and his employer, Howard, Weil, Labouisse, Friedricks, Inc., a brokerage firm, alleging that the Bank had released the stock in reliance on Liuzza’s representations that he was acting as Charia’s agent. In turn the broker third-partied Charia, alleging express authorization to sell the stock and buy other, and Charia third-partied Liuzza and Howard, Weil, alleging their unlawful taking of the stock.
The principal demand was severed and tried before the judge, who rendered judg *727 ment in favor of the Bank in May, 1976.[1] Charia did not appeal and eventually paid the judgment. On November 18, 1976 a summary judgment was rendered dismissing Charia’s third party demand against Liuzza and Howard We}l on the basis of prescription. Again Charia did not appeal.
Charia’s reconventional demand was tried on November 29, 1976 before a jury, which found in favor of the Bank.[2] Charia has appealed from this judgment, and the dismissal of Charia’s reconventional demand against the Bank is now before this court.[3]

Liuzza’s Authority

The principal question decided by the jury was whether Liuzza was authorized by Charia to receive delivery of the pledged stocks.
Liuzza had represented Charia in stock transactions in 1966 and 1967, while Liuzza was with another brokerage firm. In December, 1967 Liuzza and two other registered representatives moved to Viguerie, Hayne & Chaffe (VH&C), which subsequently merged with Howard Weil. Liuz-za’s relationship with Charia thereafter is in substantial dispute.
Liuzza testified: Charia’s investments during 1966 and 1967 were largely unsuccessful, and Charia had been reluctant to make further investments. One reason for his transfer to VH&C was to have available the research services of Clark Dodge, a VH&C corresponding firm, and he attempted to convince Charia to invest strictly in accordance with Clark Dodge’s recommendations on a trial basis. On April 30, 1968 Charia finally allowed him to sell some stock rights, which he accomplished the following day, the check for $50.45 being delivered to Charia and negotiated. He and Charia then reviewed the portfolio and decided to sell certain stocks (held in pledge by the Bank) based on Clark Dodge’s recommendations as soon as those stocks came within the recommended range and to use the money generated by these sales to purchase other stocks, also in accordance with Clark Dodge’s recommendations. Charia remarked that he would never trade with him again if these investments were not successful. In May, June and July he was in almost daily contact with Charia, and his sales assistant furnished Charia with many quotations and numerous brochures and publications. On June 3 and 4 he sold certain stocks with verbal telephone authority from Charia (virtually 100% of his sales and purchases for customers were based on telephone authority), and written confirmations of these transactions were mailed immediately to Charia, who admitted receipt. Furthermore, the transactions appeared on the regular monthly statements, which Charia also admitted receiving. Thereafter, on June 3 and 14 he purchased other stocks in 100-share lots (one being Penn Central Railroad), pursuant to telephone authority from Charia, and finally on June 18 he purchased with telephone authority 44 shares of another corporation with the remaining proceeds of the sales, leaving Charia with a credit balance of $30.65. As with the sales, the purchases were made when the stocks reached the level recommended by Clark Dodge, and the transactions were confirmed immediately in writing and later on the monthly statement. Charia did nothing to repudiate these sales and purchases. On July 11, pursuant to a Clark Dodge recommendation and with Charia’s telephone authority, he sold the 100 shares of Penn Central, realizing a profit of $7.00 per share, and then on July 15, based on similar recommendation and authority, he repurchased 100 shares of Penn Central when the stock dropped to the level of the June purchase, leaving Charia with a credit balance of over $700.00. Charia was initially de *728 lighted with the Penn Central transactions and the immediate rise of another stock, but unfortunately the Penn Central shares continued to decline, as did the other stocks. In the meantime he had requested the Bank to deliver the stock held in pledge for the purpose of substituting the newly acquired stock. In the past, pledged stock that he had sold for Charia was either delivered to him by the Bank or by Charia’s runner or sometimes was picked up by him, and Charia told him to handle this transaction in similar fashion with the Bank. When the delivery of the stock sold in June, 1968 was unduly delayed, he recontacted the Bank, and the stock was finally delivered by the Bank on November 11, 1968. Meanwhile, back at Charia’s office after the decline of the stock in late July, Charia refused to accept his (Liuzza’s) phone calls, and he was told Charia never wanted to speak to him again. He continued to mail Charia information on the stocks, but did not hear from Charia again until the firm received a letter in November, 1968, in which Charia refused to sign stock powers after the Bank had released the stock.
Liuzza’s version was corroborated by his sales assistant and by another registered representative who had transferred to VH&C with him.
Charia’s version was: He did not authorize the sales and purchases by Liuzza in June and July, 1968. He first became aware that the Bank had released the stock to Liuzza when he received an April, 1969 letter from the Bank, advising that 100 shares of Penn Central were missing from collateral received in substitution for the released stock and that it was necessary to produce the stock or otherwise offset the margin deficiency. He replied by certified mail that he had not authorized VH&C to obtain any stock or the Bank to release any stock and demanded return in kind of the original stocks.[4] He also forwarded to the Bank all stock dividends received thereafter.
On cross-examination Charia was confronted with a March, 1975 affidavit executed by him in connection with a motion for summary judgment, in which he stated he was unaware of the transactions until he received the November, 1968 request from VH&C to sign stock powers, but in which he also mentioned receipt of monthly statements showing the transactions. Charia then explained that he had repudiated the transactions in a July 8,1968 letter to Liuz-za (which Liuzza denied receiving) and that although he had received the written confirmations and was thus aware immediately after the transactions that the stock had been sold, he did not think the Bank would release the stock without his authority and did not learn the Bank had done so until the April, 1969 letter. Charia also admitted introducing Liuzza at the Bank as his broker, but denied authorizing release of any stock to him.
Three Bank employees testified that when Charia’s pledged stock was sold, it was usually released on his telephone authority to his broker. Although no verbal authority was obtained from Charia for release of this stock, Charia had taken Liuzza to the Bank and had represented that Liuz-za was the broker who handled his stock.
As to the disputed letter of July 8, 1968, Charia swore that he found a copy in November, 1975, denying the letter was an afterthought which was not really confect-ed in 1968. Other evidence, however, showed Charia had a conference with the Bank president on July 10, 1968 and was meeting with him weekly at the time, but had never mentioned the unauthorized sale of the pledged stock until the April, 1969 letter. Moreover, the admittedly received sales confirmations served to inform Charia, as a sophisticated investor, that the stock would have to be released by the Bank to complete the transaction.
On the basis of the evidence discussed above the jury could reasonably have concluded that Charia authorized Liuzza to sell the stock pledged to the Bank and that *729 the express authorization carried with it the authority to obtain the pledged stock from the Bank for the purpose of selling and substituting other stock. Furthermore, under the overall circumstances Charia had clothed Liuzza with the apparent authority to obtain delivery of pledged stock for the purpose of an authorized sale. Therefore, if this record is properly constituted and the jury was properly charged, there is adequate support for the jury’s credibility determination.

Evidentiary Rulings

As Charia correctly points out, little weight should be accorded to the resolution of conflicting testimony by a jury verdict which has been substantially influenced by inadmissible evidence or by excluded admissible evidence. In this regard Charia first argues that his attempt to prove the disputed July 8 letter was prejudiced by the trial judge’s refusal to allow use of depositions to impeach the testimony of Liuzza and his sales assistant.
While prior inconsistent statements may be used to impeach the credibility of a witness, the determination of whether the statement is sufficiently inconsistent to be presented to the jury on the issue of credibility is within the trial judge’s discretion. At trial Liuzza denied receiving the July 8 letter. In the deposition excluded by the trial judge Liuzza stated he first became aware that Charia denied his authority “(m)uch later” when his firm received a letter from Charia. In the same answer Liuzza went on to discuss Charia’s unhappiness with the market decline in July and Charia’s refusal to talk to him in late July or early August, but he never mentioned July as the date of Charia’s letter disputing his authority. Since Liuzza’s deposition statement more probably referred to Cha-ria’s November, 1968 letter to the firm denying Liuzza’s authority, we agree there was no inconsistency between the deposition statement and the denial of receipt of the July 8 letter. The deposition was therefore properly excluded.
Liuzza’s sales assistant, who opened and screened all of his business mail, also denied receipt of the letter in her trial testimony. Her excluded deposition statement, which referred to second hand information as to when Charia first denied Liuz-za’s authority, was not contradictory of her personal knowledge that she had never seen the July 8 letter.
Charia also attempted to introduce testimony as to the practice of another brokerage firm in 1968 when a customer failed to deliver stock. This evidence was excluded as immaterial, and we find no error in that ruling.
Charia further attempted to present opinion evidence by an expert in the stock brokerage business. The trial judge refused to allow hypothetical questions on the basis that an expert who had not heard all of the testimony in this type of case could not express an opinion which would be of value to the jury.
An expert witness ordinarily can state his opinion in answer to a hypothetical question that assumes facts already in evidence. However, this witness was presented for the stated purpose of outlining the proper method of handling stock transactions, particularly with regard to liquidation of transactions. Since Charia’s claim against Liuzza and Howard Weil had been dismissed and his only remaining claim was against the Bank, it is difficult to perceive how the Bank’s liability for release of the stock to a person representing himself as Charia’s agent would be affected by evidence that Liuzza should have liquidated the transaction when the stock was not delivered by or shortly after the settlement date. If Liuzza was authorized to make the sale and to obtain delivery of the stocks, his contributing to any delay in delivery may have been a violation of security brokerage regulations (discussed later), but was not pertinent to the agency determination.[5] *730 We conclude Charia has not demonstrated any prejudice from the trial judge’s refusal to allow this evidence.

Jury Instructions

Charia’s first complaint is that the jury instructions gave the overall impression that Charia’s granting Liuzza authority to sell the stocks was equivalent to granting him authority to obtain delivery of the stocks from the Bank. In giving the instructions, the trial judge reviewed general agency law and then specially instructed the jury on the doctrine of apparent authority and on the duty of the Bank to safeguard pledged securities. We find no merit in this assignment of error.
Finally, Charia’s principal thrust in the entire appeal is that the evidence clearly establishes the Bank violated Regulation U (12 C.F.R. 221 et seq.) with regard to loans for the purpose of purchasing registered securities and Liuzza and Howard Weil violated Regulation T (12 C.F.R. 220 et seq.) with regard to extension of credit to a customer by a member of a national securities exchange. In this respect Charia assigns as error the failure to instruct the jury with regard to these federal regulations. Charia argues that regardless of any agency relationship Regulation U was an absolute prohibition against the Bank’s release of the pledged stocks.
We view the alleged violations of Regulation T and U as issues separate and apart from the issue of damages caused by the unauthorized release of the stocks. The legal consequence of a violation of these regulations is that the rights under the contract of the party in violation are voided. 15 U.S.C. § 78g.
The rights of the Bank under the contracts, which were the promissory notes, were judicially determined at the trial of the principal demand, and Charia offered no defense based on Regulation U violations. The judgment on the principal demand is now final and definitive, and this court has no jurisdictional power and authority to reverse or modify that judgment. Perhaps if the notes had been paid without a judicial determination of the Bank’s right to collect on the notes, Charia would still have a cause of action to recover the payments based on violation of the federal regulations.[6] But he cannot allow a judgment to be rendered on the principal demand determining the Bank’s right to collect on the notes and then assert in the trial of the severed incidental action a claim based on the invalidity of the Bank’s right.
The trial judge was correct in limiting the issue in the trial of the reconventional demand to damages caused by the unauthorized release of the stocks, and he properly refused to charge the jury as to Regulations T and U.
The judgment of the trial court is affirmed. All costs are assessed to appellant.

Affirmed.

. Charia applied unsuccessfully for supervisory writs to this court and to the Supreme Court, complaining that the trial judge abused his discretion in granting the severance.

. There was therefore no necessity to adjudicate the remaining incidental demands.

.On the date this appeal was perfected the judgment dismissing Charia’s third party demand against Liuzza and Howard Weil had become definitive and had acquired the authority of the thing adjudged.

. In the reconventional demand Charia sought, among other things, the return of these shares of stock or their value at the time of the May, 1969 demand letter.

. Charia’s complaint that Liuzza and the Banks employees were allowed to testify as to their operations does not establish prejudice. This testimony was necessary to establish apparent *730 authority, not to show the proper method of operating a stock brokerage firm.

. Jurisdiction of violations of the regulations is vested exclusively in the federal district court. 15 U.S.C. § 78aa.