400 So.2d 334 (1981)
STATE of Louisiana in the Interest of Myiea CLARK.
No. 12211.
Court of Appeal of Louisiana, Fourth Circuit.
June 2, 1981.
*335 New Orleans Legal Assistance Corp., Archie B. Creech, New Orleans, for appellant.
Harry F. Connick, Dist. Atty., Paul G. Mayoral, Asst. Dist. Atty., Juvenile Div., New Orleans, for appellee.
Before GULOTTA, GARRISON and CHEHARDY, JJ.
GULOTTA, Judge.
Mellovenia Clark appeals from a Juvenile Court's finding of her child, Myiea, then four months old, to be "a neglected child and in need of care" as defined by LSA-R.S. 13:1569(16) and LSA-C.J.P. Art. 13(14). Mellovenia contends that there was insufficient evidence to support the finding and that the court based its holding on inadmissible hearsay without any direct evidence of neglect.
The State has moved to dismiss the appeal as moot since the mother has regained custody of the child, married, and moved to California with her husband and Myiea. Alternatively, the State argues on the merits that the trial court's finding is not manifestly erroneous.

MOTION TO DISMISS
At the outset, we reject the State's contention that the appeal should be dismissed as moot.
Upon finding the child to be neglected and in need of care on March 28, 1979, the trial judge placed her in the temporary custody of the Office of Family Services. Psychological and psychiatric evaluations of the mother and maternal grandmother *336 were ordered for submission to the court prior to further disposition.[1] After subsequent hearings in June and August, 1979, where further testimony was heard and psychological evaluations and home studies were submitted to the court for its review, the judge ordered the child returned to the mother on October 23, 1979 under close supervision of the Office of Human Development, which was directed to provide continued counseling services to the mother and to submit progress reports to the court.
On October 23, 1979, Mellovenia filed a motion for appeal and the record was lodged in this court on December 23, 1980. On February 6, 1981, the State filed a motion in this court to dismiss the appeal on the ground that the mother had since married and moved with the child to a comfortable home in California "with the blessing and concurrence of the Office of Human Development". Attached to the motion to dismiss is a copy of a letter dated January 16, 1981 from the Office of Human Development to the trial judge indicating that the mother had married on December 6, 1980 and had moved to Los Angeles.
Appellate courts do not give opinions on moot questions or abstract propositions from which no practical results can follow.[2] However, as was stated in State In Interest of Gray, 353 So.2d 393 (La.App. 4th Cir. 1977), the sanction against a parent is severe where a finding of neglect has been made. To dismiss this appeal as moot would effectively foreclose the mother from attacking any alleged errors in the neglect proceeding and deny her the right to appeal.
For these reasons, we deny the motion to dismiss.

SUFFICIENCY OF EVIDENCE
At the March 28 adjudicatory hearing, the trial judge heard the testimony of two social workers, a psychologist, the mother and maternal grandmother of the child, an aunt and friends of the family.
Stella Schwarze, a psychological social worker at Charity Hospital, learned of Myiea's possible neglect on January 31, 1979 from Ida Clark, the child's maternal grandmother. The grandmother went to the hospital on a routine regularly scheduled visit for her own medical needs. According to Ms. Schwarze, Ida related that her daughter Mellovenia had reached "the end of the rope" and had been brought to the Crisis Intervention Unit at Charity to see a psychologist on January 16. According to Ms. Schwarze, Ida told her that Mellovenia had not made adequate practical or financial preparations for the baby during her pregnancy, had slapped the child once when it was two months old to make it stop crying, and had stated once that she did not care if the baby starved when there was no milk in the refrigerator. Ms. Schwarze testified that the grandmother also had told her Mellovenia had punched the wall twice, shaken the bed, pulled her hair, and screamed to be taken to the hospital on January 16. Based on the grandmother's statements, this social worker felt that there was great emotional conflict in the family, that the grandmother was afraid of possible child abuse with the daughter's nervousness, that the baby was the focus of the anger, and that the possibility existed the mother would "blow up" again and injure the child. Schwarze therefore referred the case to the Office of Human Development for investigation.
Although she had not personally checked out the physical condition of the child or interviewed Mellovenia, Schwarze was of the opinion that there existed a latent danger to the child and that to return the baby to the unimproved home situation would jeopardize the welfare of the baby. This witness recommended that the baby remain in foster care and that Mellovenia be encouraged to live her own life and obtain employment with the view of introducing *337 her back to child care with day care assistance.
Jeanne Elder, a social worker in the Office of Human Development, testified that she had received an emergency referral from a social worker at Charity Hospital who was concerned that the Clark baby was in danger. Ms. Elder went to the Clark household on January 31, 1979 and talked to Mellovenia, the mother, and Ida, the maternal grandmother. Elder testified that Ida was "very anxious" and wanted her daughter Mellovenia to sign a voluntary placement of the baby for adoption since they were not capable of handling the child. According to Elder, Mellovenia said she would like to place the baby with relatives because it made her "nervous". This social worker further testified that the grandmother had said that Mellovenia once hit the baby to stop it from crying. According to Elder, both the mother and grandmother said Mellovenia was angry with her father, the child's maternal grandfather, because he had rejected her at the time of her pregnancy out of wedlock. Elder was of the opinion that even though the child appeared to be normal and healthy without signs of abuse and the home itself was clean, the animosity between the mother and grandmother created a latent danger to the child. This social worker felt that the mother should seek professional help and that it was dangerous to send the child back to her home.[3]
Dr. Edward Shwery, a clinical psychologist, also testified. Although he had not interviewed the grandmother or the mother and had not seen the child at the time of trial, he had reviewed Elder's affidavit upon which the neglect petition was founded. Given a hypothetical situation where the maternal grandparents, the mother and the three-month-old child lived in a neat house, where animosity existed between the mother and the grandmother, where the mother had slapped the baby to make it stop crying on one occasion, and where the other alleged incidents outlined in Elder and Schwarze's testimony existed, Dr. Schwery was of the opinion that it would be possible for the mother to harm the child and that it would be better to remove the child from the environment rather than subject it to emotional confusion.
On the other hand, in her testimony before the court, Ida Clark, the grandmother, denied ever saying Mellovenia had spanked the baby or had mistreated it. Ida testified that Mellovenia had suffered an attack of asthma on January 16 and had been taken to the hospital complaining of head pain. According to Ida, Mellovenia at no time had said that she could not take care of the baby. At trial Ida said Mellovenia has never hit the baby, neglected it, or become nervous if the baby does not stop crying. Ida further testified that she had not told Schwarze that she and Mellovenia were near a breakdown.
Mellovenia testified that she was not so nervous or sick that the baby had to be taken away from her. She attributed the screaming and hair pulling incident on January 16 to some medication she had been taking. She denied ever telling Elder that she does not take care of the baby or that she would hurt it if someone did not stop her. She stated that she had never hit the baby or thrown it down. According to Mellovenia, although she had asked her father to leave because of his drinking, there were no serious arguments in the home affecting the baby. Mellovenia and Ida's testimony concerning the home environment and absence of neglect and mistreatment was corroborated by other witnesses frequenting the family home.[4]
LSA-C.J.P. Art. 73 provides that in child neglect proceedings the State shall prove the allegations of the petition "by a preponderance of the evidence." LSA-C.J.P. Art. *338 71 further states that the adjudication hearing "shall be conducted according to the rules of evidence applicable to civil proceedings." The general rule of inadmissibility of hearsay evidence is one such rule of evidence that has been enforced in child neglect proceedings. See State In Interest of Prestridge, 323 So.2d 868 (La.App. 2nd Cir. 1975).[5]
Hearsay evidence is defined as testimony in court, or written evidence of a statement made out of court, the statement being offered as an assertion to show the truth of matters asserted therein, and thus resting for its value upon the credibility of the out-of-court asserter. State v. King, 355 So.2d 1305 (La.1978). In other words, it is a statement that is offered in evidence to prove the truth of the matters therein stated, but that is not made by the author when a witness before the court at the particular trial in which it is so offered. Veal v. Hutchinson, 284 So.2d 60 (La.App. 4th Cir. 1973), writ denied 286 So.2d 662 (La.1973). Hearsay evidence is excluded as being unreliable because it is based upon statements made by persons who are not before the court, have not been sworn and are not available for cross-examination. Lambert v. Heirs of Adams, 325 So.2d 331 (La.App. 3rd Cir. 1976), application denied 329 So.2d 458 (La.1976).
Where the declarant is before the court and available for cross-examination, the unreliability of the hearsay is considerably removed. Accordingly, modern authorities have taken the position that evidence of a hearsay declaration is admissible if the judge finds that the declarant is present and subject to cross-examination. See Model Code of Evidence, Rule 503(b); Uniform Rules of Evidence, Rule 63(1). See also, the discussion in McCormick, Evidence, 2nd Ed., § 251.
In our case, the social workers testified concerning oral statements made to them by either Ida or Mellovenia, or both. These statements were made in connection with the social workers' professional investigation of the case and formed the basis of their opinions concerning the child's welfare. Both Ida and Mellovenia were present at the hearing, testified and underwent cross-examination. Under these circumstances, their pre-trial statements made to the social workers, even if hearsay in nature, cannot be viewed as unreliable. We therefore find no error in the ruling of the trial judge admitting this testimony into evidence.
We likewise find no error in the trial court's apparent reliance on Dr. Shwery's opinion. This witness was accepted as an expert psychologist and was competent to give an opinion in answer to a hypothetical question that assumed facts already in evidence. Bank of La. in New Orleans v. Charia, 359 So.2d 724 (La.App. 4th Cir. 1978).
Accordingly, even though no direct evidence of child neglect was adduced at trial, the testimony of the social workers and the psychologist concerning the potential harm to the baby was sufficient to support the trial judge's finding of neglect. Finding no error, we affirm the judgment of the trial court.
AFFIRMED.
NOTES
[1] The child and its unwed mother were living with the mother's parents in their home.
[2] See United Tchrs. of New Orleans v. Orleans Parish Sch. Bd., 355 So.2d 899 (La.1978); Upper Audubon Ass'n. v. Audubon Park Com'n., 329 So.2d 209 (La.App. 4th Cir. 1976).
[3] At the time of the hearing, the child was in the custody of the State. On the basis of Elder's investigation, the judge had issued an oral "hold order" and the baby was removed from the Clark home on February 1, 1979.
[4] These witnesses testifying on behalf of the mother were Minevia Riley (Mellovenia's aunt), and Adele Powell, Laurene Jones and Jessie Temple (friends of the family).
[5] LSA-R.S. 13:1579.1, repealed by Acts 1978, No. 172, § 5, formerly provided that hearsay evidence could be considered by the trial judge in neglect proceedings.