BARRY, Judge.
Pearl Marshall appeals a jury verdict which denied any recovery for alleged injuries she received in an automobile accident.
On June 7, 1982 Marshall was in her automobile when Ernest Duncan backed a tractor trailer truck into her automobile. Marshall, her husband Irvin, and their minor Michele, sued Duncan and Ryder Truck Rental, Inc., owner of the truck, which third partied NORDAP, Inc., the trdck’s lessee.
A supplemental petition requested a jury trial. A second supplemental petition deleted Irvin Marshall because he and Pearl were legally separated, changed Michele’s status to reflect that she was no longer a minor, and requested damages were increased to $2,350,000. A third supplemental petition named as defendants NOR-DAP, Inc. and its insurer Carolina Casualty Insurance Company, and amended the petition to state that NORDAP had leased the truck and Duncan was acting as NOR-DAP’s employee at the time of the accident.
Prior to trial Marshall dismissed all defendants except Carolina Casualty which stipulated liability. The only issues were causation and damages. Ten of twelve jurors answered “No” to the first question on the verdict form: “Did Pearl Marshall suffer any injury in the accident of June 7, 1982?”
*692 Marshall specifies two errors: (1) the jury disregarded the evidence and testimony of medical experts; (2) the judge erred by reading to the jury a prior allegedly inconsistent statement in a deposition by Marshall’s medical expert.
TRIAL TESTIMONY
The jury heard two plaintiff and two defense medical experts plus Marshall's testimony. The report of Dr. Gordillo, Marshall’s general practitioner, was stipulated.
Dr. Gordillo first saw Marshall on April 6, 1982 (the transcript states 3/6/82) after she had been rearended in an auto accident on March 24, 1982. Her medical history noted a 1976 auto accident in which she injured her lower back. Dr. Gordillo’s report indicated Marshall had a decrease in neck motion and pain in the right side of her neck. He found severe muscular spasms in the right paravertebral area of the back. Marshall was able to reach mid-thigh bending forward and straight leg raising was painful at 45 degrees on the right and 55 degrees on the left. Neurological symptoms were normal and x-rays of the cervical spine showed no fracture, dislocation or disease. X-rays of the lumbar spine showed a very slight scoliosis, but no evidence of fracture or disease. He prescribed anti-inflammatory medication, muscle relaxants and physical therapy. Dr. Gordillo saw Marshall on May 24, 1982 when she was having neck and back pain and he referred her to Dr. Jose Garcia Oiler, a neurosurgeon.
Dr. Gordillo saw Marshall on June 11, 1982, four days after the subject accident. Neck and back pain continued. He noted the results of her physical examination were unchanged. On July 2 she continued to have neck and back pain and on August 2, 1982 she was feeling slightly better.
Marshall had another auto accident on August 16, 1982. She saw Dr. Gordillo on August 25, 1982 and had severe pain in the mid thoracic vertebrae with spasm and tenderness.
During subsequent visits on September 24, October 25, November 16, December 14, 1982, January 11, February 8, March 11, 1983, Marshall continued to improve. By March 25, 1983 there were no objective findings. Dr. Gordillo’s diagnosis was a musculoligamentous tear in the left trapezi-us muscle. The prognosis was excellent for full recovery. It was stipulated that Dr. Gordillo would have testified that Marshall’s injuries were the result of the three ,1982 auto accidents.
Dr. Oiler, a neurological expert, testified that he first saw Marshall on May 28, 1982 when she complained of severe neck and back pain and headaches. She had a 15 degree rotation instead of 80 degrees and a limitation of extension to 25 degrees (instead of 50 degrees). There was spasm in the neck muscles. Marshall could not stand straight and Dr. Oiler ordered a hard neck collar. He saw Marshall on June 7, 1982 just before the subject accident.
Dr. Oiler said that by July 2, 1982 her neck problem had not worsened because she was wearing a collar at the time of the June 7 accident. Marshall complained of severe pain and stiffness in the spine. The neck had improved, but the vertebral column was rigid. She could move 10 degrees forward and had 15 degrees extension.
Dr. Oiler felt the June 7 accident caused severe thoracic lumbar pain. On July 20, 1982 the cervical spine continued to improve and she had a normal range of motion. Marshall still had spine pain from the middle of the chest to the belt line. Extension improved to 25 degrees. She complained of persistent headaches.
When Dr. Oiler saw Marshall on September 3, 1982 she had been in a fourth accident in which a car hit the left front door and fender of her vehicle. Marshall’s left leg was numb and she had pain in the chest. An EKG was normal. Marshall’s bending improved to 30 degrees and flexion to the side was 15 degrees. There was tenderness in the chest.
On September 24, 1982 the chest pain was gone, the neck was better, but low back pain remained. Dr. Oiler saw no sign of sciatic nerve or compression problems and ordered a corset. His diagnosis was a *693 contusion and stretch injuries of the left hip, thoracic and lumbar muscles, a ligament of the spine, left shoulder, and a ligament of the chest muscle. She had severe back pain and limitation of motion and Dr. Oiler concluded she had deep muscle and ligament injuries.
By December 3, 1982 Marshall wore a brace and was able to drive, although she could not work. She complained of pain in the buttocks and left lateral calf which indicated a nerve was affected. There was no palpable spasm and no deviation of the spine on standing.
Dr. Oiler saw Marshall on April 2, 1984. She told him she had gone back to work a year earlier as a terminal controller with Alabama Great Southern Railroad [Norfolk and Southern Railroad] although she wore a corset and could not sit for long. Her remaining symptoms were tenderness over the lower back vertebrae and mild neck discomfort.
Not until Dr. Oiler’s examination on March 3,1986 did Marshall inform him of a fifth auto accident on February 4, 1984. She was a passenger in her sister’s car when it was hit from the left. She continued to work after the accident although she had a problem sitting for long periods of time, her neck would stiffen, and she had pain in her low back and left leg. Marshall’s neck had recovered except for minimal tenderness. The dorsal spine (chest portion) had very mild tenderness of certain spinous processes. She had full range of motion except at 75 degree flexion there was a moderate spasm. Bending forward she had a spasm in the left lumbar region. Examination of the lower extremities was normal except for some pulling at straight leg raising of 75 degrees. He did not think surgery was necessary and concluded her condition was permanent.
Marshall had a CAT scan and MRI (magnetic reasonance imaging) study on October 9, 1986. At trial Dr. Oiler read the report of Dr. Daniel Johnson, an x-ray specialist of the head, neck and spine. Dr. Johnson found no vertebral body deformity or compression, no unusual expansion of the spinal cord, and no mass lesion. Dr. Johnson indicated (1) minor bulging of the lumbosacral disk more pronounced posteri-orly with MRI evidence of disk degeneration, but no herniation (2) minor circumferential bulging of the L4-5 and L 3-4 disk, and (3) no abnormality of the lower thoracic spine or spinal cord.
Dr. Oiler’s review of the CAT scan and MRI study was in his November 4, 1986 report. He concluded there was a mild midline bulge at L4-5 and L5-S1 and toward the SI nerve root. He saw Marshall on December 4, 1986 and found mild cervical spine tenderness, daily lumbar pain and recurrent bilateral sciatica into the ankles and numbness.
On April 3, 1987 he concluded Marshall had (1) chronic, recurrent neck pain and stiffness of a mild degree without nerve involvement; (2) chronic lumbar disk injury with L4-5 bulge and marked L5-S1 disk damage and bulge with compression of the membrane that holds the disk, with signs of sciatic nerve stretch and lumbar compression; (3) lumbar spine injury of the back and leg pain which affected Marshall’s life at home and work.
Dr. Oiler said the lumbar injury had been initiated by the subject June 7, 1982 accident, and the sciatic nerve root injury by the August 16, 1982 accident. Dr. Oiler testified Marshall had an overall 12% total body disability as follows: structural damage to disk L5 — 4%; damage to disk L4— 1%; limitation of motion — 2%; pain and lack of sleep — 3%; sciatic nerve injury and leg pain — 2%.
On cross-examination Dr. Oiler testified that after Marshall’s March 24, 1982 accident, his examinations on May 29 and June 7,1982 indicated only pain in the neck area. Dr. Oiler stated that after the June 7, 1982 accident Marshall experienced lumbar pain and a limitation of lumbar motion.
Defense counsel questioned Dr. Oiler relative to his September 28, 1982 report (which covered examinations on September 3 and 24, 1982) following Marshall’s accident on August 16, 1982. His diagnosis was: a contusion and stretch type injury of the left hip, thoracolumbar muscles, ligament and spine, and left shoulder; a liga *694 ment injury at the external attachment of the pectoralis muscle with severe chest pain; severe back pain and limitation of movement. He stated the cause of the injuries was the August 16, 1982 accident. The report ended with a comment that the patient remained totally disabled as a result of the August 16, 1982 accident. When questioned as to that conclusion, Dr. Oiler explained he was referring to the new disabling injuries (since his last report) caused by the August 16 accident. He stated he treated Marshall for a back injury since June, 1982 and did not want his report to invalidate that fact.
Defense counsel focused on Dr. Oiler’s May 31,1984 report which listed three accidents. Referring to the “last” accident (meaning August, 1982) and contrary to his trial testimony, Dr. Oiler’s report concluded there were no mechanical or neurological signs of a ruptured disk. At trial the doctor took issue with that statement in light of the subsequent CAT scan and MRI study in October, 1986 that showed structural damage to the spine and disk.
Dr. Oiler testified that his clinical opinion in the 1984 report was wrong as shown by the 1986 tests. Dr. Oiler maintained that the severe back injury was caused by the June 7, 1982 accident, but conceded that prior to the August, 1982 accident there was no severe nerve pressure or a disk problem. The doctor admitted that at one point during Marshall’s treatment he expressed the opinion (thinking the damage to be to the muscles and ligaments) that Marshall might make a substantial clinical recovery within six months. However, in light of the CAT scan and MRI information Dr. Oiler testified that his prior opinion as to no disk problem and a six month recovery was incorrect.
Defense counsel attempted to impeach Dr. Oiler by using his statements from a deposition on November 6, 1986 for Marshall v. Elazab, a suit arising from one of the 1982 accidents. His deposition was taken after he reviewed the CAT scan and MRI study. Over objection and for impeachment purposes, the trial judge read the questions and Dr. Oiler’s answers from the deposition. The doctor stated that Marshall’s cervical injury from the March, 1982 accident and her injuries from the June, 1982 accident would have resolved by about December, 1982.
Dr. Oiler complained of counsel’s method of questioning. He stated that he based his deposition on his clinical exam although he had an opportunity to review the test results. He claimed that no one asked him about the CAT scan or MRI study during the deposition. The deposition was proffered.
Dr. Russell Grunsten, orthopedist, testified that he saw Marshall on December 23, 1986 and she told him she had neck and low back pain after the March and June, 1982 accidents. His examination showed a full range of neck motion with no tightness or spasm. She had her full range bending backward and to the left and right and complained of pain on bending forward 45 degrees. From the sitting position she could move to 80 — 90 degrees in straight leg raising. He testified that those findings were inconsistent because they measure the same problem. Since both calves had the same circumference, there was no evidence of protection of one leg or inequi-valent nerve supply.
Lying face up Marshall complained of discomfort at about 60 degree (⅜) elevation of either leg. She did not feel discomfort until 90 degree flexion of each leg. Dr. Grunsten stated that those two tests measure the same problems and should be comparable, yet his findings were inconsistent. Her reflexes were normal with no sensory loss of the legs.
Dr. Grunsten said x-rays of Marshall’s neck showed a minimal scoliosis due to her posture. Disk spaces were within normal limits and low back vertebra appeared normal with no alteration in disk heights. Dr. Grunsten concluded that marshall presented an entirely normal clinical evaluation as to mechanical functions of her neck and low back. He found considerable variation in the flexing capacity indicated by different inconsistent test results. He saw no indication of a healing reaction in the neck or low back in the x-rays taken over a *695 period of years (although Dr. Johnson had noted marginal spurring).
Dr. Grunsten testified that the 1986 x-rays showed a totally healthy person who had overcome whatever injuries she incurred in the 1982 auto accidents. He saw no reason for Marshall to continue wearing a corset or to restrict normal physical or job activity. Dr. Grunsten reviewed the CAT scan and MRI study and concluded there was normal bulging probably at all five disk levels. He saw no compression of the membrane that holds the disk.
Dr. Richard Levy, neurosurgeon, testified that he saw Marshall on October 16, 1987. His history shows Marshall suffered neck and lower back pain after the March 24, 1982 accident and prior to the June 7, 1982 accident. Dr. Levy found no muscle spasm and a full range of head motion. Marshall could bend forward 45 degrees. She felt pain when the doctor pressed his thumb over the spine in the neck and lower back region. Her calves were equal. On straight leg raising she felt pain at 20 degrees. Reflexes were normal. Dr. Levy noted both limitations of motion were based solely on Marshall’s subjective complaints of pain.
Dr. Levy concluded there was no evidence of neurological disability. There was no sign of a spinal cord injury or nerve root injury in her neck or low back region or an injury to the nerves in the arms or legs. Dr. Levy reviewed the CAT scan and MRI study. He saw a bulge at L4-5, but concluded that was normal in a thirty-five year old person. The other degenerative changes, including the bulging at L5-S1 disk, were also normal. Dr. Levy found that Marshall had no neurological basis for her injuries and the injuries sustained in 1982 were musculoligamentous in nature.
Pearl Marshall testified that after the March, 1982 accident she suffered with her upper back, left shoulder and neck. After the June, 1982 accident she experienced lower back pain and after the August, 1982 accident she had pain in her left hip and left leg.
During cross-examination, defense counsel used Marshall’s September 9, 1985 deposition from another lawsuit for impeachment purposes. In the deposition, when asked about her constant lower back pain, she stated she experienced back pain between March and June, 1982 and felt the same pain after the June accident. At trial she maintained that back pain started after the June accident. Marshall explained the contradictory statements by stating that counsel was leading her and perhaps she was ill the day of the deposition.
It was stipulated that Marshall missed one year of work due to injuries from the 1982 accidents. She testified that she last saw Dr. Gordillo in March, 1983, but still felt miserable at the 1988 trial. Her marriage broke up because she could not fulfill her duties as a wife and mother. Activities such as jogging and bowling ended. Marshall claimed to still have lower back pain.
ERROR NO. 2
We will first discuss Marshall’s second argument that the trial court erred by reading Dr. Oiler’s allegedly inconsistent prior deposition statement which prejudiced the jury.
A prior inconsistent statement of a witness is admissible to impeach the witness. The statement’s use is limited to impeachment purposes and cannot be utilized as evidence of the substantive content of the prior statement. Smith v. New Orleans Public Service, Inc., 391 So.2d 962 (La.App. 4th Cir.1980). If the trial testimony is not consistent with the prior statement, the jury must determine if the testimony is to be discredited or what weight, if any, to give to the testimony. Lewis v. Variste, 422 So.2d 222 (La.App. 4th Cir.1982). The determination as to whether the statement is sufficiently inconsistent to be presented to the jury on the issue of credibility is within the trial judge’s discretion. Bank of Louisiana in New Orleans v. Charia, 359 So.2d 724 (La.App. 4th Cir.1978), writ denied 362 So.2d 576 (La.1978).
The trial judge correctly charged the jury as to the limited use of the allegedly prior inconsistent deposition statement before he read the pertinent passage from *696 Dr. Oiler’s deposition. We find no abuse of the trial court’s discretion in his determination that the statement was sufficiently inconsistent to present it to the jury. Whether Dr. Oiler’s testimony was discredited in any way was a question for the jury.
We find no merit in that argument.
ERROR NO. 1
Marshall argues the jury disregarded the testimony of her medical experts which clearly indicated she was injured in the June 7, 1982 accident.
The jury heard detailed testimony from Marshall’s experts, Dr. Oiler and Dr. Gor-dillo, and defense experts Dr. Grunsten and Dr. Levy. The jury concluded that Marshall did not prove that she was injured in the June 7, 1982 accident.
Marshall testified that her lower back injury was caused by the June, 1982 accident, but her deposition testimony that she had back pain prior to that accident cast doubt on her testimony.
Dr. Gordillo’s report states that prior to the June accident Marshall complained of neck and back pain. His May 24, 1982 and June 2, 1982 notations indicate Marshall was having neck and back pain. Dr. Gor-dillo’s diagnosis was a musculoligamentous tear caused by the several 1982 accidents and she had an excellent prognosis for full recovery. Dr. Gordillo found Marshall had no objective findings by March 22, 1983.
Dr. Oiler linked the lower back injury (which only he felt involved disk problems and nerve root irritation) to the June 7, 1982 accident. However, his September 28, 1982 report attributed Marshall’s back pain and limitation of movement as well as the stretch injury to the left hip and chest muscle to the August 16, 1982 accident. He was the only expert to testify that the June 7, 1982 accident caused the lower back problem.
Dr. Oiler’s May 31, 1984 report concluded that there was no mechanical or neurological sign of a ruptured disk. When Dr. Oiler took issue with his 1984 report which was written before he had the MRI study and CAT scan, defense counsel properly utilized the doctor’s prior November 6, 1986 deposition testimony that the ligament injuries with no severe findings of disk would resolve by December, 1982.
Dr. Grunsten noted inconsistencies in Marshall’s flexing capacities from test to test, the lack of any indication of a healing reaction, and concluded Marshall had completely overcome her injuries by 1986.
Dr. Levy found no spinal cord or nerve root injury and thought the disk bulging was normal degeneration. The report of Dr. Johnson, x-ray specialist, found minor bulging with evidence of disk degeneration but no herniation.
Our review of the conflicting medical testimony does not convince us that the jury manifestly erred in its conclusion that Marshall did not prove she was injured in the June 7, 1982 accident. See Canter v. Koehring Company, 283 So.2d 716 (La.1973); Garrett v. New Orleans Public Service, Inc., 459 So.2d 746 (La.App. 4th Cir.1984).
The judgment is affirmed.
AFFIRMED.