51,053 (La.App. 2 Cir. 9/28/16)

**STATE of Louisiana IN the INTEREST OF A.H.**

**No. 51,053-JAC**

Court of Appeal of Louisiana, Second Circuit.

Judgment rendered September 28, 2016

Rehearing Denied 10/19/2016

WALTMAN & WALTMAN, LLC By: Angela Ginn Waltman, Counsel for Appellant, Holly Hunter

GRAYDON K. KITCHENS, JR., JOHN MICHAEL LAWRENCE, Assistant District Attorneys, Counsel for Appellee, State of Louisiana DCFS

LEGAL SERVICES OF NORTH LOUISIANA By: Sangbahn Y. Scere, Counsel for A.H.

Before CARAWAY, LOLLEY, and STONE, JJ.

STONE, J.

This action arises from the Twenty-Sixth Judicial District Court, Juvenile Division, Webster Parish, the Honorable Jeff Thompson presiding. This dispute concerns a minor child. The State received an anonymous report of drug use and dependency regarding the child. Subsequently, drug testing was done on the mother of the child and the child, and both tested positive for amphetamines and methamphetamines. Thereafter, the trial court determined the child was in need of care. For the following reasons, we reverse the decision of the trial court.

**Factual Background**

On November 2, 2015, the Louisiana Department of Children and Family Services ("DCFS") received an anonymous report alleging drug use and drug dependency of an 11-year-old boy, A.H.[1] In response to the report, DCFS contacted the mother of A.H., Holly Hunter ("Hunter"), to request that she and A.H. submit to hair and urine drug testing. On November 5, 2015, Hunter and A.H. submitted to drug screens at Omega Laboratories ("Omega"). The results of the drug screens indicated that both Hunter's and A.H.'s hair and urine were positive for amphetamine and methamphetamine.[2] On December 30, 2015,

Hunter allowed A.H. to be drug tested again; however, Hunter refused to submit to a second drug test. Omega conducted the second drug screening on A.H. The results were again positive for amphetamine and methamphetamine, and in fact, the results showed increased levels of methamphetamine in A.H.

On January 6, 2016, a verbal instanter order to take A.H. into DCFS custody was granted, but neither Hunter nor A.H. could be located. Consequently, on January 12, 2016, the verbal instanter order was rescinded. Thereafter, on January 14, 2016, an arrest warrant was issued and signed for Hunter's arrest for cruelty of a juvenile. Hunter was subsequently found and arrested in Texas on January 19, 2016, and A.H. was transported by a family member back to Louisiana. On that same date, the court granted a verbal instanter order to take A.H. into DCFS custody. A continued custody hearing was held on January 21, 2016, and the court found that it was in the best interest of A.H. to remain in the custody of DCFS. Since that time, A.H. has been residing with his aunt, Terri Eldridge.

On February 17, 2016, DCFS filed a petition seeking to have A.H. adjudicated as a child in need of care as defined by La. Ch. C. art. 606, et seq. In its petition, DCFS stated that A.H. was the abused and/or neglected minor of Hunter and there was good cause to believe A.H. could not be adequately protected from the dangers of continued neglect due to drug dependency.

The adjudication hearing was held on April 4, 2016. Hunter testified that she was contacted by DCFS and asked if she and

---

1. Pursuant to URCA 5-1 and 5-2, the initials of the child are used to protect the minor child's identity.

2. Hunter's older son, who is not a party in this matter, also submitted to a drug screening. His results indicated a positive reading for both amphetamines and methamphetamines.

A.H. could submit to drug tests. When the state presented Hunter with a document that purportedly showed the results of the drug tests, Hunter asserted her Fifth Amendment right as to whether the document was a true copy of the drug results. Hunter again asserted her Fifth Amendment right when asked if A.H. submitted to a drug test, whether the results of A.H.'s drug tests indicated positive readings for amphetamines and methamphetamines, and to almost every remaining question concerning the drug tests. Hunter stated that her first encounter with DCFS was a result of allegations that she was running a meth lab in her house and that she was not properly caring for A.H. by failing to treat him for scabies and lice. According to Hunter, nothing ever came of these allegations because there was no criminal evidence to support the meth lab and no medical evidence to support the allegations concerning A.H.'s health. Hunter also testified that she had been working the case plan that DCFS had given her and was visiting with A.H. at every possible chance.

Angelisa Strayhan, an investigator for DCFS, testified that after receiving a report concerning the lack of supervision and drug dependency of A.H., she ordered drug screens for both Hunter and A.H. According to Strayhan, Hunter was drug tested once and A.H. was drug tested on two separate occasions. Strayhan received the results of the drug tests and personally observed positive results for both amphetamines and methamphetamines for A.H. and Hunter. Strayhan testified that after receiving the results, she accompanied the DCFS case worker to the home of Hunter's mother to speak with Hunter but the two were advised that neither Hunter nor A.H. was at the residence and their whereabouts were unknown. Thereafter, Strayhan received a report that Hunter and A.H. were in Texas. After Hunter was arrested, Strayhan had an opportunity to speak with Hunter and A.H. concerning the drug allegations with A.H. Hunter told Strayhan that she had taken A.H. to Texas to avoid having A.H. taken by DCFS. Hunter also stated she believed DCFS would take A.H. from her care because he had tested positive for methamphetamines and she had a friend in Texas who was going to take guardianship of A.H. A.H. likewise told Strayhan that he and Hunter moved to Texas to avoid DCFS taking him because he tested positive for methamphetamines.

During the hearing, the State questioned Strayhan about documents that purportedly showed the results of the drug tests administered to Hunter and A.H. Counsel for Hunter objected that these documents were inadmissible hearsay evidence. The trial court sustained the objection and the drug results were not admitted under an exception to the hearsay rule. Even so, the trial court allowed Strayhan to testify that she recognized the documents as copies of the results of A.H.'s and Hunter's drug tests, that the document portrayed positive readings for both amphetamine and methamphetamines, and that A.H.'s methamphetamine level was higher in the second test than it was in the first.

Lieutenant Scott Tucker, a detective with the Webster Parish Sheriff's Office, was also allowed to give testimony concerning the purported drug test reports. He testified that he obtained copies of the drug test results from DCFS and observed positive readings for amphetamines and methamphetamines for both Hunter and A.H. Detective Tucker also testified that A.H.'s second test result showed a higher level for methamphetamines than when A.H. was initially tested. Detective Tucker further testified that he accompanied other officers to the home of Hunter's mother to assist DCFS with taking A.H. into custo-

dy. After learning that Hunter had gone to Texas, Detective Tucker obtained an arrest warrant and arrested Hunter in Texas.

Georgina Jones, Hunter's sister-in-law, testified that she previously lived in the home with Hunter, A.H., and Hunter's older son, from approximately May 20, 2015, to October 15, 2015. Jones stated that during her stay, she never saw any evidence of illegal drug use in the home and that she witnessed a stable family relationship. According to Jones, she never saw Hunter engage in any kind of drug activity and Hunter and A.H. had a good relationship. Jones testified that although she was no longer living with Hunter at the time of the investigation, she was shocked to hear of the alleged drug use. Finally, Jones indicated she would have no concern with A.H. returning home and being in the custody of Hunter.

The DCFS child welfare supervisor also presented the case plan to the trial court. In the case plan, DCFS stated that the goal was reunification. DCFS recommended that A.H. remain in the care of his aunt until Hunter finished her case plan. The supervisor testified that Hunter had been compliant with all the requirements of her case plan and was doing well with her visitations with A.H. DCFS estimated it would take Hunter four to five months to complete the case plan, but stated the time could be shorter if Hunter continued to perform well.

The trial court signed a judgment of adjudication on April 18, 2016, declaring A.H. a child in need of care and ordering A.H. to remain in the custody of DCFS. In its reasoning, the court stated the following to Hunter:

> The State has met its burden to show that when the children were taken that there were good reasonable grounds for the State to intervene and be concerned about the safety of A.H. I think, also, that you've shown a willingness to take steps necessary to alleviate those concerns in the future, and I commend you for doing that. But the reason that we're here is that at that moment in time, and for a period before that, and maybe after that, there were reasonable grounds for people to have concerns that he was going to be a child in need of care. And I believe that they have satisfied that obligation and that legal standard.

The court further stated:

> I wanted to hear more about your willingness to take the steps necessary to reunify with your child. I am impressed by the testimony from the representatives of the Department of Children and Family Services, that you're doing and wanted to go above and beyond. That's good. I wish the circumstances had never existed to cause this to be necessary, but they did. And I think the department, I think law enforcement and everybody else did exactly what they were supposed to do, and hopefully, we've averted a crisis. So I'm going to find that the child is in need of care and set a date going forward to allow you, ma'am, to continue to work your plan, and hopefully not have to come back here if things are successfully completed in short order.

Hunter now appeals.

### Discussion

Hunter argues that the trial court erred in its finding that the State met its burden of proving by a preponderance of evidence that A.H. is a child in need of care in accordance with La. Ch. C. art. 665. Hunter argues the document purportedly showing the drug test results was inadmissible hearsay because no employee from Omega authenticated the results, interpreted the results, or testified as to the chain of cus-

tody of the results. Hunter claims that the trial court's decision to allow testimony from Strayhan and Detective Tucker concerning the drug test results was a way to circumvent Hunter's objection to the introduction of the document itself. Hunter alleges that not only were Detective Tucker and Strayhan allowed to testify as to the wording of the report, but they were asked to interpret the results and draw conclusions, which neither was qualified to do. Hunter asserts the recitation of the results by Detective Tucker and Strayhan was the only evidence considered by the court to adjudicate A.H. a child in need of care. According to Hunter, the court's sole reliance on such recitation, without the actual report itself, was not sufficient to satisfy the State's burden.

As a threshold matter, we note that this matter does not involve the issue of whether A.H. should be permanently removed from Hunter's custody by the termination of her parental rights. Rather, the issue presented is whether reasonable grounds existed to believe that it was in the best interest of A.H. to be adjudicated a child in need of care and to be removed from the physical custody of Hunter.

The main area of contention in this dispute is the admissibility of Strayhan and Detective Tucker's testimony about what they saw on the paper copies of the drug test reports.[3] On direct examination, Strayhan and Detective Tucker were questioned by the State as to whether they had knowledge of the drug tests' results, and both stated that they had seen the report in one manner or another. Over repeated objections by counsel for Hunter, both witnesses were allowed to testify that the reports came back positive. In the case of

Hunter, they testified that she was subjected to one test, which came back as positive for amphetamines and methamphetamines. In the case of AH, they testified that he was tested twice, a month apart and that both results were positive. Detective Tucker read from the report and testified that the values shown in the "quantitative analysis" columns were higher on the first test than the values shown in the same columns on the second test.

The purpose of Title VI of the Children's Code, entitled "Child in Need of Care," is "to protect children whose physical or mental health and welfare are substantially at risk of harm by physical abuse, neglect, or exploitation and who may be further threatened by the conduct of others[.]" |₈La. Ch. C. art. 601; *State ex rel. L.M.*, 46,078 (La.App. 2 Cir. 1/26/11), 57 So.3d 518. The health, safety, and best interest of the child shall be the paramount concern in all proceedings under Title VI. *Id.*

A juvenile court's determination that a child is a "child in need of care" under La. Ch. C. art. 606 is based on findings of fact, and an appellate court cannot set aside a juvenile court's findings of fact in the absence of manifest error or unless those findings are clearly wrong. *In re A.J.F.*, 2000–0948 (La. 6/30/00), 764 So.2d 47. If a juvenile court's findings are reasonable in light of the record reviewed in its entirety, the appellate court may not reverse, even though convinced that had it been sitting as trier of fact, it would have weighed the evidence differently. *Id.* see also *Pinsonneault v. Merchants & Farmers Bank & Trust Co.*, 2001–2217 (La. 4/3/02), 816 So.2d 270.

**3.** Strayhan testified that she had no special education or knowledge relevant to chemistry or performing drug tests, and that she could not explain the drug test processes. However, she testified that she was familiar with seeing drug test reports. Detective Tucker testified that he knows how to read the test reports, but he also mentioned that he only became aware of AH's second test and its results from talking to Child Protective Services.

In order to reverse a fact finder's determination of fact, an appellate court must review the record in its entirety and (1) find that a reasonable factual basis does not exist for the finding, and if such a basis does exist, (2) further determine that the record establishes that the fact finder is clearly wrong or manifestly erroneous. *Williams v. State ex rel. Dept. of Social Services*, 37,923 (La.App. 2 Cir. 1/28/04), 865 So.2d 908, *writ denied*, 2004–0514 (La. 4/8/04), 870 So.2d 276. If there are two permissible views of the evidence, the fact finder's choice between them cannot be manifestly erroneous or clearly wrong. *Stobart v. State, Dept. of Transp. & Dev.*, 617 So.2d 880 (La.1993).

The applicability of the rules of evidence in "child in need of care" proceedings is governed by the stage of the proceeding in which the evidence is being submitted. Under La. Ch. C. art. 624(F), "hearsay evidence is admissible" in a continued custody hearing. In addition, under La. Ch. C. art. 680, at a disposition hearing, which happens after the child has been adjudicated a child in need of care, a court "may consider evidence which would not be admissible at the adjudication hearing," including hearsay. However, La. Ch. C. art. 663(A) states that the rules of evidence applicable in civil proceedings govern adjudication hearings. The matter before this Court occurred during the adjudication stage of the proceeding.[4]

Hearsay is defined as "a statement, other than one made by the declarant while testifying at the present trial or hearing, offered in evidence to prove the truth of the matter asserted." La. Code Evid. art. 801(C). Given the unreliable nature of such evidence, hearsay is inadmissible at adjudication hearings unless it falls under one of the enumerated statutory exceptions found in La. Code Evid. art. 803. The Code of Evidence also makes clear in article 1101(A)(1) that "juvenile adjudication hearings in non-delinquent proceedings shall be governed by the provisions of this Code applicable to civil cases." Aside from these provisions, case law has shown that the rule of inadmissibility of hearsay evidence should be enforced in juvenile adjudication proceedings.[5]

In the instant case, none of the drug test reports from Omega were admitted into evidence during the course of the adjudication hearing. At various times in the proceeding, counsel for the State offered them for introduction. However, on each of these occasions, counsel for Hunter objected on the grounds that the reports were inadmissible hearsay and no foundation was laid for them to be admitted pursuant to any exception or exemption. The trial court either sustained the objection or the proffer of the reports was withdrawn. Notwithstanding, two witnesses were allowed to testify as to the results of the drug tests solely on the basis of having previously read those reports.

A similar situation to the one, in this case, was addressed by the Third Circuit Court of Appeal in *State ex rel. A.A.*, 2014–658 (La.App. 3 Cir. 10/1/14), 148 So.3d 968, 976, *writ granted, judgment rev'd*, 2014–2509 (La. 1/9/15), 156 So.3d 648. The moth-

---

4. Respondent's brief seems to summarily argue that the proceeding was a disposition hearing, not an adjudication hearing, and therefore the relaxed evidentiary rules mandated by La. Ch. C. art. 680 should be applied to allow the testimony. This Court rejects that argument and finds that the drug test results were offered at an adjudication hearing on April 4, 2015.

5. *See State, in the Int. of Prestridge*, 323 So.2d 868 (La.App. 2d Cir.1975); *State, in the Int. of Garza*, 388 So.2d 458 (La.App. 2d Cir.1980); *State, in the Int. of Rotolo*, 361 So.2d 468 (La.App. 4th Cir.1978); *State in the Int. of Clark*, 400 So.2d 334 (La.App. 4th Cir.1981); *State ex rel. D.H.*, 906 So.2d 554 (La.App. 1st Cir.2005).

er contended that the trial court relied on impermissible hearsay evidence in adjudicating the children in need of care. Her argument was premised on the fact that videotapes of forensic interviews, which allegedly confirmed allegations of abuse, were not admitted into evidence; however, the trial judge allowed testimony and references to the content and results of the forensic interviews "because it showed the findings of the investigation." In his oral reasons for adjudicating the children in need of care, the trial judge referenced the testimonies concerning the interviews. On appeal, the court found that such evidence was hearsay because the trial judge relied on those testimonies for the truth of the matters asserted. Since this was legal error, the court struck the testimonies and performed a *de novo* review of the record to determine if there was sufficient basis remaining for the trial court's adjudication.

Similarly, in the instant matter, the supposed drug reports formed the basis of the alleged personal knowledge of both Strayhan and Detective Tucker and they were allowed to repeat inadmissible hearsay evidence into ⌊₁₁the record. By way of comparison, this situation is no different than if the technician who had performed the tests had telephoned Strayhan and Detective Tucker and told them that the results were positive. Neither Strayhan nor the detective would be able to repeat the statements of the technician because they would be hearsay, out-of-court statements made by someone other than the declarant offered in evidence to prove the truth of the matter asserted. Likewise, this matter is closely analogous to *State ex. rel. A.A.*, *supra*, because it involves inadmissible hearsay being relied upon by the judge as support for the adjudication.

■ ▮▮ Although the testimony offered by the witnesses regarding the results of the drug tests was inadmissible hearsay and should not have been admitted during the adjudication hearing, the error alone does not warrant a reversal. A reversal requires application of the manifest error doctrine. The court must review the entire record *de novo* for properly admitted evidence that establishes a reasonable factual basis for the trial court's finding. If such a basis does not exist, the appellate court must conclude that the fact finder is clearly wrong or manifestly erroneous.

▮ At an adjudication hearing, the state has the burden to prove the allegations of the petition by a preponderance of evidence. La. Ch. C. art. 665; *State in Int. of JK*, 33,878 (La.App. 2 Cir. 6/23/00), 764 So.2d 287, *writ denied*, 2000–2637 (La. 10/6/00), 771 So.2d 83. Proof is sufficient to constitute a preponderance of the evidence when the entirety of the evidence, both direct and circumstantial, establishes that the fact or causation sought to be proved is more probable than not. *Talbot v. Talbot*, 2003–0814 (La. 12/12/03), 864 So.2d 590; *Pearce v. Medallion Const.*, 36,351 (La. App. 2 Cir. 11/6/02), 830 So.2d 576.

▮ ⌊₁₂Based on a review of the record, it appears that the only evidence that the trial court relied upon in making its ruling was the description of the drug test results given in the testimonies of Strayhan and Detective Tucker. Specifically, there was no mention of A.H. being in need of medical care, nourishment, supervision, or that the living situation with Hunter was otherwise unsuitable.[6] In light of there being no other evidence of neglect or abuse, this Court finds that the state did not meet its burden of proving by a preponderance of evidence that A.H. was a child in need of

---

**6.** In fact, there was testimony that the child was consistently in good health, had a good relationship with the mother, and had suitable accommodations and nourishment provided by his mother.

care and the trial court was manifestly erroneous in its determination.

## Conclusion

For the foregoing reasons, we reverse the ruling of the trial court and remand to allow further proceedings on the adjudication issue, with instructions that a full review be held on the validity of the drug tests.

**REVERSED AND REMANDED.**

APPLICATION FOR REHEARING

Before CARAWAY, LOLLEY, and STONE, JJ.

Rehearing denied.